David MCGRATH, Plaintiff,

v.

John L. JOHNSON, et al., Defendants.

No. CIV.A. 98–6595.

United States District Court,
E.D. Pennsylvania.

May 1, 2001.

Andrew G. Gay, Philadelphia, PA, David McGrath, S.C.I. Graterford, Graterford, PA, for plaintiff.

Theodore E. Lorenz, Office of Attorney General, Philadelphia, PA, for defendants.

Frank Robert Cori, Assistant Count Solicitor, Pottsville, PA, for William Allar.

### MEMORANDUM

LOWELL A. REED, Jr., Senior District Judge.

Plaintiff David McGrath ("McGrath") filed this civil rights complaint as a *pro se* litigant while he was an inmate at the State Corrections Institution at Albion ("SCI–Albion") against the Department of Corrections ("DOC"), and nine DOC offi- cials: Mahanoy Superintendent Martin L. Dragovich, Mahanoy Deputy Superinten- dent Edward Klem, Mahanoy Unit Manag- er James Unell, Mahanoy Counselor John L. Johnson, Mahanoy Security Officer John Doe, DOC Secretary Martin Horn, DOC Deputy Commissioner William J. Love, DOC Coordinator of Classification Don Williamson, Pittsburgh Superinten- dent James S. Price, and Pittsburgh Coun- selor Dan DeFloria (collectively "defen- dants" or "Commonwealth defendants"), pursuant to 42 U.S.C. § 1983, alleging vio- lations of his First, Eighth and Fourteenth Amendment rights in addition to state law tort claims, and seeking monetary, injunc- tive and declaratory relief.

After considering the motion to dismiss filed by defendants, this Court dismissed all claims except: (1) a claim for injunctive relief against defendants Horn, Love and Williamson; (2) a claim for declaratory relief against all defendants; (3) a First Amendment claim for retaliation and the associated allegations of the alleged retal- iatory conduct. *See McGrath v. Johnson,* 67 F.Supp.2d 499 (E.D.Pa.1999). Plaintiff is now represented by counsel.

Presently before the Court is the motion of the Commonwealth defendants for sum- mary judgment on the claims which sur- vived the motion to dismiss, (Document No. 46), pursuant to Federal Rule of Civil Procedure 56, and the response of plaintiff McGrath, (Document No. 49), thereto. Jurisdiction is proper pursuant to 28 U.S.C. § 1331. Based on the following analysis, the motion will be granted.

### I. Background[1]

McGrath accuses defendants of pursuing a widespread conspiracy to retaliate

---

1. The following background is based on the evidence of the record viewed in the light most favorable to McGrath, the nonmoving party, as required when considering a motion for summary judgment. *See Carnegie Mellon*

against him for filing a private criminal complaint. Specifically, McGrath contends that after he attempted to seek redress through the courts, defendants increased his custody level, transferred him to a prison which had been documented as a place of danger, and denied him parole.

When McGrath filed the complaint, he was serving an 11-to-30-year sentence for murder, criminal conspiracy, possessing an instrument of crime, and two counts of aggravated assault to which he pled guilty. He is now on parole, although it is unclear precisely when his parole began. The long and detailed series of events which led to this suit began when McGrath was an inmate at the State Corrections Institution at Mahanoy ("SCI–Mahanoy").

On March 28, 1996, Mahanoy Superintendent Dragovich ("Superintendent Dragovich" or "Dragovich") apparently reversed a unanimous decision by the unit staff to recommend McGrath for parole. On or about April 2, 1996, in a response to a letter by McGrath to Dragovich, the Superintendent explained that he decided to not recommend McGrath for parole because McGrath was only four months past a decision to give him a three year set back. (Defs.' Ex. D–16.) Dragovich further explained that the practice is to support an early parole upon completion of half of the setback. (*Id.*) In sum, according to Dragovich, it was too early for McGrath to be considered for parole. (*Id.*)

On April 21, 1996, McGrath incurred a misconduct for threatening Mahanoy Corrections Officer Michael D. Koles ("Officer Koles") and the officer's family with bodily harm, refusing to obey an order during a strip search, and using abusive or obscene language to an employee. (Defs.' Ex. D–1.) McGrath was found guilty of the misconduct on April 23, 1996, and appealed

the decision. (*Id.*) The Program Review Committee sustained the decision of the hearing officer on May 13, 1996, and Superintendent Dragovich denied a further appeal on May 20, 1996. (*Id.*) In its final review, the Central Office Review Committee on July 8, 1996 sustained the decision by the hearing officer. (*Id.*)

On May 31, 1996, McGrath's custody level changed from a two to a three as a result of the Pennsylvania Additive Classification Tool ("PACT"), a system used to periodically evaluate inmates in order to assess individual security needs. (Pl.'s Ex. 39 (explaining PACT); Defs.' Ex. D–6 (McGrath's May 31, 1996 PACT.)) The following factors are considered in the objective assessment: the severity of the current offense, the severity of criminal history, history of institutional violence, number of misconducts, age, escape history, program participation, work report, and housing reports. (Pl.'s Ex. 39.) According to McGrath's PACT, his custody level increased as a result of the April misconduct. (Defs.' Ex. D–6.)

On July 17, 1996, McGrath filed a private criminal complaint in the Schuylkill County Court of Common Pleas against Officer Koles, essentially alleging that the orders given during the search, particularly being asked to bend over, spread his buttocks, and cough, served no legitimate purpose, and that the misconduct report was "fraudulent." (Defs.' Ex. D–2.) The Schuylkill County District Attorney ("DA") "disapproved" McGrath's attempted private criminal complaint because it is the practice of the DA to turn such matters over to the Special Investigations Unit of the Department of Corrections. (*Id.*) On August 1, 1996, Superintendent Dragovich received a notice from Vaughn L. Davis ("Davis"), the DOC Director of the Office

*Univ. v. Schwartz,* 105 F.3d 863, 865 (3d    Cir.1997).

of Professional Responsibility, that McGrath had filed the complaint. (Pl.'s Ex. 27.) On November 4, 1996, the Court of Common Pleas of Schuylkill County dismissed McGrath's petition for review of the disapproval of the DA, finding that the referral policy of the DA was not an abuse of discretion. (Defs.' Ex. D–3.) On December 9, 1996, Davis informed McGrath by letter that his allegations regarding the misconduct were "unsubstantiated."[2] (Defs.' Ex. D–5.)

On August 30, 1996, plaintiff apparently signed a contract to work in the prison as a library aid. (Am.Compl.Ex. 2–D.) According to McGrath, the job was later blocked by either Captain McGrady, who is not a defendant, or another unknown "security officer." (Pl.'s Aff. ¶¶ 8–10.) On September 10, 1996, McGrath requested assistance from Deputy Superintendent Edward Klem ("Deputy Superintendent Klem" or "Klem") in securing employment in the prison and informed him of the criminal complaint which he had filed. (Am.Compl.Ex. D–1.) Klem responded that he would discuss the situation with Mr. Wall, who is not a defendant in this case. (*Id.*) In October of 1996, McGrath was denied a job in the Education Department by Kenneth Chmielewski ("Chmielewski"), Mahanoy School Principal, who is also not a defendant in this case. (Pl.'s Ex. 31.) Chmielewski explained to plaintiff that many qualified applicants had applied for the position. (*Id.*) Before these job events, on July 9, 1996, McGrath had agreed to be an aid to a handicapped inmate, John Dolan. (Am.Compl.Ex. 15–C.) Counselor John L. Johnson ("Counselor

Johnson" or "Johnson") approved of the volunteer position, but did not recognize the job as a permanent position because it was not within his job duties to determine what constitutes employment. (Johnson Interrog., Defs.' Ex. A ¶ 20.)

On October 17, 1996, McGrath filed a motion for an evidentiary hearing in the Court of Common Pleas of Schuylkill County, repeating the allegations regarding Officer Koles. (Defs.' Ex. D–4.) On October 31, 1996, Detective William Allar and Chief Detective Terry Noll interviewed McGrath, Officer Koles, two inmates, and two prison officials.[3] (Defs.' Ex. D–17.) On November 7, 1996, Detective Allar sent an investigation report to District Attorney Claude A. Lord Shields. (*Id.*) The DA never prosecuted a case against Detective Koles based on the allegations made by McGrath.

On October 17, 1996, another PACT was conducted which resulted in McGrath's custody level being upgraded from level three to level four. (Defs.' Ex. D–9.) The re-classification inquiry notes that the reason for the re-classification was the April misconduct; however, the factors for consideration vary from the May PACT. (*Id.*) Specifically, two additional codes are listed under the severity of the current offense, his program compliance changed from "compliant" to "motivated/waiting to com, [sic]" his work status changed from "average" to "idle," and his housing performance changed from "average" to "below average." (*Id.*) Plaintiff asserts that the PACT inaccurately portrayed his housing

---

**2.** It appears that the Special Investigations Unit of the Department of Corrections Office, which was the office to which the DA refers private criminal complaints, may have been either renamed the Office of Professional Responsibility or incorporated into the Office of

Professional Responsibility. (McGrath Dep. at 42–43.)

**3.** McGrath alleges without support in the record that defendants gave Detective Allar a report which reflected an inaccurate number of misconducts.

performance.[4] It appears from deposition testimony of plaintiff, that at some point Johnson explained to plaintiff that his previous Counselor, Ms. Tyson, had excluded some of plaintiffs' criminal convictions from her PACT analysis, thereby assessing an inaccurate custody level. (Pl. Dep. at 57; Johnson Interrog., Def. Ex. A at ¶ 6) (explaining inaccuracies.)

On or about November 15, 1996, McGrath wrote a letter to Donald Williamson, DOC Coordinator of Classification, ("Coordinator of Classification Williamson" or "Williamson"), disputing the legitimacy of his level upgrade. (Am.Compl.Ex. 1.) It appears that in response, Williamson spoke with McGrath's sister on November 21, 1996, and explained the reasons for the upgrade. (*Id.*) McGrath also provides an affidavit of inmate John Dolan ("Dolan") alleging that he (Dolan) heard Counselor Johnson say that the decision to increase McGrath's custody level was "out of [his] hands" and "came from the top." (Pl.'s Ex. 61.) Johnson denies this accusation. (Johnson Interrog., Defs.' Ex. A at ¶ 8.)

On November 23, 1996, McGrath filed a grievance, essentially challenging his level four status. (Defs.Ex. D–13.) Mahanoy Unit Manager James Unell ("Unell") denied the grievance on December 6, 1996, finding no errors in the PACT. (*Id.*) Unell's summary further noted that on December 6, 1996, Unell and Counselor Johnson met with McGrath to explain the October PACT. (*Id.*) Superintendent Dragovich upheld Unell's findings on December 13, 1996, and Commissioner Martin Horn ("Commissioner Horn") denied McGrath's final appeal on January 24, 1997. (Defs.Ex. D–13.)

On October 28, 1996, a vote sheet was circulated requesting that McGrath be transferred to another prison to reduce the number of inmates in level four custody at SCI–Mahanoy. (Pls.' Ex. 57.) Johnson, Unell and Dragovich each signed the vote sheet.[5] (*Id.*) On November 7, 1996, Counselor Johnson submitted the transfer petition explaining, *inter alia*, that because McGrath is now a level four inmate, he requires closer supervision and that SCI–Mahanoy needs to reduce the number of level fours in its custody. (Pl.'s Ex. 59.) Apparently, the petition wrongly assessed McGrath's total misconduct count. (Am. Compl., Ex. 3.) Plaintiff further notes as significant that the transfer petition was sent before the signatures were gathered on the Vote Sheet. (Pl.'s Exs. 57, 59.)

On January 13, 1997, Superintendent Dragovich recommended against parole for McGrath. (Pl.'s Ex. 60.) Dragovich noted that since his last parole staffing, McGrath had incurred a misconduct and had not completed any additional programs. (*Id.*) Plaintiff argues that he had finished a program. In support, however, he relies on a letter indicating that he had *applied* to graduate from the Board of Governors Bachelor of Arts Degree Program at Western Illinois University. (Am.Compl., Ex. 1–C.) The letter explains that McGrath still had some courses to *complete.* (*Id.*)

On February 5, 1997, McGrath was transferred to State Correctional Institution at Pittsburgh ("SCI–Pittsburgh"). Coordinator of Classification Williamson, among others who are not defendants, formally approved this transfer. (Williamson Interrog., Defs.' Ex. G at ¶ 2.) Defendants contend that upon this transfer McGrath

4. McGrath further alleges that defendants refused to furnish him with his housing records during discovery.

5. It appears that another prison official signed the Vote Sheet; however, the signature is not legible to this Court. (Pls.' Ex. 57.)

requested administrative custody. (Def. Mem. at 8.) Prison records, however, provide conflicting evidence as to whether McGrath made such a request. A memo sent to Thomas Fulcomer, Acting Executive Deputy Commissioner, and William Harrison, Director of Inmate Services ("Director Harrison" or "Harrison"), suggests that the Program Review Committee ("PRC") determined that McGrath could not be placed in general population at SCI–Pittsburgh because of the racial overtones of his sentence. (Pl.'s Ex. 53.) A grievance review suggests that plaintiff requested self lockup. (Am.Compl. 19–B–2.) McGrath testified during his deposition that the prison system made the decision to place him in restricted housing. (McGrath Dep. at 166.)

On February 14, 1997, McGrath wrote a request to the PRC asking for certain privileges. (Am.Compl.Ex. 8.) On March 6, 1997, prison official Winstead responded that McGrath should express these concerns at his next review. (*Id.*) On April 22, 1997, Price explained to plaintiff by letter that under prison rules, his PRC Committee determines which privileges he receives. (Am.Compl., Ex. 19.) On March 19, 1997, McGrath filed a grievance requesting privileges and on March 20, 1997, he filed a grievance regarding the incorrect number of misconducts in his prison record. (Am.Compl., Ex. 19.) On March 24, 1996, Activities Director Edward Howe, who was on plaintiff's PRC committee, wrote a memo to McGrath, apparently in response to a memo from McGrath, acknowledging that the transfer petition listed an inaccurate number of misconducts and suggesting that McGrath be released into general population upon the next PRC committee meeting. (Am. Compl., Ex. 3.) On May 22, 1997, DOC Secretary Martin Horn upheld the decision by staff members regarding which privileges McGrath was entitled. (Am.Compl., Ex. 19.)

In March of 1997, McGrath was denied parole. Plaintiff claims that he was denied parole largely because he was living in restrictive housing. Defendants maintain that the parole decision originated from Mahanoy. (Price Interrog., Defs.' Ex. H, ¶ 19.) According to defendants, because McGrath had applied for early parole review, had incurred a misconduct and had not completed any programs, his March parole hearing was not fully "staffed." (Unell Interrog., Defs.' Ex. C, ¶ 7.)

On May 15, 1997, Pittsburgh Superintendent James Price ("Price") and McGrath's Counselor Daniel DeFloria ("DeFloria") sent a transfer request to Director Harrison, who is not a defendant. (Pl.'s Ex. 53.) McGrath alleges that at some point DeFloria told him that he (DeFloria) would intentionally submit transfer petitions that would result in McGrath not being able to transfer so that McGrath would learn not to file a complaint against a guard. (Pl.'s Aff. at ¶ 42.) DeFloria denies that these statements were made. (DeFloria Interrog., Def. Ex. I at ¶ 15.) Price and DeFloria explained on the actual petition that the transfer request was for security reasons. (Pl.'s Ex. 53.) The petition was denied by Harrison. (Williamson Interrog., Def. Exs. G at ¶ 2, G–1 at ¶ 13.) Price and DeFloria sent a another transfer request on July 28, 1997. (Pl.'s Ex. 54.) The petition requested a transfer to a rural state correctional institution with a smaller population where plaintiff would be "afforded the benefit of treatment services to qualify for parole at the next review date." (*Id.*) It appears that this petition was granted as McGrath was transferred to SCI–Albion in October of 1997.

In short, McGrath essentially alleges that defendants engaged in a widespread

conspiracy to retaliate against him for filing a private criminal complaint. Specifically, as a result of pursuing court action, McGrath asserts that defendants increased his custody level, transferred him to a prison where it was known that he could not be in general population thereby refusing him certain privileges, and denied him parole.

## II. Legal Standard for Summary Judgment

According to Rule 56(c) of the Federal Rules of Civil Procedure, a court may grant summary judgment if "... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). As to determining which facts are "material," the substantive law acts as a guide. See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. Additionally, "inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). "A court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998).

The moving party initially bears the burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). The non-moving party must then, "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, 106 S.Ct. 1348, and must produce more than a "mere scintilla" of evidence to demonstrate a genuine issue of material fact and avoid summary judgment. See Big Apple BMW, Inc. v. BMW of North Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992).

## III. Analysis

■ I make two conclusions at the outset. First, since McGrath is currently on parole, his claim for injunctive relief, in the form of a request for transfer out of SCI–Pittsburgh, is clearly moot. Likewise, since there is evidence acknowledging an inaccurate number of misconducts in his prison record, (Am.Compl., Ex. 3), plaintiff's prayer for correct records is also moot. Second, while neither party seems to address the issue, according to the docket, plaintiff has also sued the Department of Corrections. Pennsylvania's DOC, however, is a part of the Commonwealth's executive department. See Lavia v. Commonwealth of Pa., 224 F.3d 190, 195 (3d Cir.2000) (citing Pa.Stat.Ann., tit. 71, § 61), and the Commonwealth is not deemed a "person" under section 1983 and therefore is immune from suit. See Independent Enterprises Inc. v. Pittsburgh Water and Sewer Auth., 103 F.3d 1165, 1172 (citing Will v. Michigan Dep't. of State Police, 491 U.S. 58, 109 S.Ct. 2304,

105 L.Ed.2d 45 (1989) for determination that states are immune from suit under section 1983 because they are not a "person"). Thus, the DOC is barred from suit under section 1983 and is entitled to summary judgement as a matter of law.

As to the remaining claims, the Court of Appeals for the Third Circuit recently clarified both the elements of a cause of action for retaliation and the burdens of proof necessary to succeed upon such a claim. First, a prisoner must prove that he was engaged in a constitutionally protected activity. *See Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir.2001). Second, a prisoner must demonstrate that he "suffered some 'adverse action' at the hands of the prison officials." *Id.* (quoting *Allah v. Seiverling,* 229 F.3d 220, 225 (3d Cir. 2000)). This requirement is satisfied upon showing that "the action 'was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights.' " *Id.* (quoting *Allah,* 229 F.3d at 225).

Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him." *Id.* (quoting *Mount Healthy Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)). The burden then shifts to the defendant who must "prove by a preponderance of the evidence that it would have taken the same disciplinary action even in the absence of the protected activity." [6] *Id.* It is well noted, however, that the task of prison administration is difficult and the decisions of prison officials require deference. *See id.* at 334; *see also, Shaw v. Murphy,* 532 U.S. 223, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001) (page references unavailable) (noting that in determining whether a prison regulation is " 'reasonably related to legitimate penological interests,' " a prisoner "must overcome the presumption that the prison officials acted within their 'broad discretion.' ") (citations omitted). Accordingly, "once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials *may still prevail* by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Id.* (emphasis added) (citing *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. 568 and *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987)). Thus, the plaintiff must meet a high standard in order to succeed in a retaliation claim.

The focus of this Court lies with the final element of the retaliation claim, as I find it dispositive of the issue before me.[7]

---

**6.** While some circuits have adopted the above burden-shifting framework, *see Thaddeus–X v. Blatter,* 175 F.3d 378, 399 (6th Cir.1999)(en banc); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Babcock v. White,* 102 F.3d 267, 275 (7th Cir.1996), other circuits either expressly or impliedly require the plaintiff to meet a "but for" test. *See Goff v. Burton,* 7 F.3d 734, 737 (8th Cir.1993); *Woods v. Smith,* 60 F.3d 1161, 1166 & n. 26 (5th Cir.1995); *McDonald v. Hall,* 610 F.2d 16, 18 (1st Cir. 1979). *See also Rauser,* 241 F.3d at 333–34, 334 n. 2 (recognizing split).

**7.** I recognize that defendants argue that plaintiff's complaint was baseless and therefore not protected and that the analysis should end there. This Court agrees with defendants that while filing a complaint in a court of law is protected activity, frivolous lawsuits are not similarly protected. *See San Filippo v. Bongiovanni,* 30 F.3d 424, 437 (3d Cir.1994). Defendants essentially contend that because plaintiff lost each appeal and the District Attorney's Office did not prosecute his claims, plaintiff's filing was frivolous. This Court finds this reasoning unpersuasive.

*Black's Law Dictionary* provides the following definition: "A claim is frivolous ... if a proponent can present no rational argument based upon the evidence or law in support of

Plaintiff essentially alleges that a series of retaliatory events occurred after he filed the private criminal complaint, which culminated in his placement in restricted housing in SCI–Pittsburgh and were carried out by nine prison officials located in various prison facilities.[8] I analyze these actions in turn.

### Increased Custody Level

█ McGrath contends that his second custody upgrade, which occurred as a result of the October 17, 1996 PACT, did not happen until *after* Mahanoy defendants received notice that McGrath had filed a private criminal complaint.[9] Defendants argue that the second increase occurred because McGrath's former counselor, Ms. Tyson, inaccurately assessed the severity of the offenses for which plaintiff was serving his sentence. (Johnson Interrog., Defs.' Ex. A ¶ 6.) The prison then needed to adjust his custody level in order to protect and maintain security in its facility. (*Id.;* Pl.'s Ex. 39.) I conclude that defendant's explanation is reasonably related to a legitimate interest of maintaining prison safety.

Plaintiff argues that his PACT was conducted out of sequence. PACTs, however, are executed "periodically" not yearly, thus there is no indication that it was unfairly conducted. (Pl.'s Ex. 39; Johnson Interrog., Defs.' Ex. A ¶ 7.) Plaintiff also furnished this Court with an affidavit of inmate John Dolan which claims that Dolan overheard Johnson say that McGrath's custody level was increased because of "orders from the top." (Pl.'s Ex. 61.) Johnson denies this accusation. (Johnson Interrog., Defs.' Ex. A ¶ 8.) Even assuming Dolan's version is truthful, however, defendants still present a legitimate argument that McGrath's original PACT was wrongly assessed.

that claim." *Black's Law Dictionary* 668 (6th Ed.1990). It has been noted that a complaint may be dismissed as frivolous "when it posits 'factual contentions [that] are clearly baseless.'" *Robinson v. Love*, 155 F.R.D. 535, 536 (E.D.Pa.1994) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989)). "Clearly baseless" has been described as "'fanciful,'" "'fantastic,'" and "'delusional.'" *Id.* (quoting *Denton v. Hernandez*, 504 U.S. 25, 32–33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992)).

Plaintiff's private criminal complaint does not fall under this category of frivolous cases. Under the reasoning of defendants, no exhausted decision by prison officials could be challenged in the courts. I conclude that defendants' interpretation is too broad a reading of "frivolous."

8. For clarity, I note that the Court of Appeals for the Third Circuit has recently explained that while placement in administrative custody generally fails to create a liberty interest in and of itself, "'government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.'" *Allah v. Seiverling*, 229 F.3d 220, 224–25 (3d Cir.2000) (quoting *Thaddeus–X v. Blatter*, 175 F.3d 378, 386 (6th Cir.1999) (en banc)). Thus, while a prisoner has no constitutional right to be housed in a particular facility or to be granted certain privileges, if such actions are taken against a prisoner for filing a complaint, those actions may become actionable. *See id.*

9. Defendants allege that those defendants who participated in the custody upgrade had no knowledge of McGrath's filing and should be granted summary judgment accordingly. I find the record does not fully support defendants' contention. McGrath alleges that on May 20, 1996, he personally informed Johnson of his intentions to pursue legal action. (Pl.'s Aff. ¶ 4.) The record also indicates that on August 1, 1996, Superintendent Dragovich received written notice from Director Davis that McGrath had filed a complaint. (Pl.'s Ex. 27.) On that memorandum, there is a handwritten note dated August 26, 1996 regarding a call from Detective Allar. (*Id.*) Thus, I conclude that defendants may not succeed on that theory.

Plaintiff also asserts that his lack of employment and falsified prison records relating to housing reports and program compliance, were a result of his filing a complaint and had a negative impact on his PACT. I note first that the PACT does not list additional or false misconducts. As to the denial of employment, Counselor Johnson merely refused to recognize a volunteer job as a permanent position because it is not within his authority to make such an assessment. (Johnson Interrog., Defs.' Ex. A ¶ 20.) Further, he did not stop McGrath from volunteering. McGrath also alleges that an unknown prison official blocked a library job. However, there is no evidence that this unknown person had any knowledge of McGrath's complaint which is necessary to show the nexus between the protected activity and the retaliation. The only remaining defendant who seems to have played a role in plaintiff's job search was Deputy Superintendent Klem, and there is no evidence that he tried to defeat McGrath's attempts at seeking employment. Rather, in response to McGrath's request for help, Klem explained that he would discuss the matter with Mr. Wall. (Am.Compl.Ex. D–1.) It appears that at least one job interview was arranged and plaintiff was simply not chosen over other applicants. (Pl.'s Ex. 31.)

I conclude that each reason that defendants bring forth for why McGrath was unable to secure employment is reasonable. More to the point, however, I conclude that the record does not indicate that even with employment and different gradings for housing reports and program involvement, McGrath's custody level would have remained at three. Rather, defendants claim that it was the mistaken as-sessment of the severity of his offenses which changed his custody level. Therefore, I conclude that plaintiff has failed to raise a genuine issue of *material* fact and that defendants prevail on the claims regarding the custody change because they have demonstrated that McGrath's custody level changed for a reason which was "reasonably related to a legitimate penological interest," namely, prison safety.

### The Transfer to SCI–Pittsburgh

■ McGrath essentially contends that the transfer to SCI–Pittsburgh was a result of his filing a complaint in Schuylkill County Court. He alleges that in transferring him *to* SCI–Pittsburgh, defendants sent him to the only prison that was known as a place of danger and thus forced him to be placed in restricted housing. In other words, the actual injury seems to lie less in transferring him *out of* SCI–Mahanoy than in transferring him *to* SCI–Pittsburgh and putting him in a restricted unit.[10] Defendants assert that McGrath was transferred out of SCI–Mahanoy because that prison needed to decrease the number of level four inmates it housed. (Pl.'s Ex. 57.) I conclude that defendants' explanation for this action serves the legitimate purpose of maintaining prison security and housing abilities. Plaintiff asserts that Counselor Johnson did not obtain all the necessary signatures on the Vote Sheet before sending the transfer petition. The documents seem to indicate that Superintendent Dragovich signed the Vote Sheet before signing the transfer petition. (Pl.'s Exs. 57, 59.) However, this timing issue does not mean that defendants lacked a legitimate reason for transferring McGrath. Thus, plaintiff has failed to raise a dispute regarding a *material* fact.

---

**10.** In fact, McGrath requested to be transferred out of SCI–Mahanoy to SCI–Dallas. (McGrath Dep. at 157–58.)

The inquiry, however, does not end here. This Court must also review the actions of the three defendants who appear to have participated in the decisions to move McGrath to SCI–Pittsburgh *and* to place him in restricted housing. They are: Coordinator of Classification Williamson, who is located in the DOC Central Office, and Superintendent Price and Counselor DeFloria, who are both located at SCI–Pittsburgh. There is no evidence in the record that any Mahoney defendants participated in the decision to transfer McGrath to SCI–Pittsburgh.

Of the three defendants, only Williamson participated in the transfer decision. (Williamson Interr., Def. Ex. G at ¶ 2.) While it is clear from the record that he had notice of McGrath's filing of the private criminal complaint, (Am.Compl.Ex. 1), plaintiff has not produced any evidence that Williamson knew that upon the transfer, McGrath would be placed in restrictive housing. According to defendants, McGrath requested that placement. (Am. Compl., Ex. 19–B–2.) According to McGrath, his PRC Committee made that decision.[11] (Pl.'s Ex. 53.) Even viewing the facts in the light most favorable to plaintiff and accepting that he did not choose to be placed in restrictive housing, however, Williamson, who worked in the Central Office, did not place him in restricted housing, he only placed him at SCI–Pittsburgh. Thus, plaintiff has failed to raise a dispute regarding a *material* fact relating to Williamson's role.

As to the roles of Superintendent Price and Counselor DeFloria, plaintiff has not pointed this Court to any evidence suggesting that either of these defendants participated in the decision to place McGrath in a restricted unit. Again, these defendants apparently are not on the PRC Committee. In addition, there is no evidence that either of these defendants knew about McGrath's filing of the criminal complaint *before* the housing decision was made. McGrath alleges that he told DeFloria about the complaint on February 20, 1997. (Pl.'s Aff. ¶ 37.) However, assuming that conversation took place, it occurred *after* McGrath was placed in restricted housing. McGrath also alleges that Price received notice on April 2, 1997. (*Id.*) Again, that date occurs *after* McGrath was put in restrictive housing.

Plaintiff also contends that DeFloria conspired to prevent him from transferring out of SCI–Pittsburgh. According to McGrath, DeFloria told plaintiff that he (DeFloria) would intentionally create transfer requests that would result in a denial of transfer. (Pl.'s Aff. at ¶ 42.) DeFloria denies making such a statement. (DeFloria Interrog., Def. Ex. I at ¶ 15.) I note first that the ultimate decisionmaker in the transfer was William Harrison, Director of Inmate Services, who is not a defendant in this case. (Williamson Interrog., Def. Exs. G at ¶ 2, G–1 at ¶ 13.) Moreover, even if this conversation did occur, there is no evidence that a transfer request premised on prison safety would result in a denial of that request. In addition, DeFloria submitted a second transfer request which was approved, and McGrath was subsequently transferred to SCI–Albion in October of 1997. Thus, it appears that DeFloria could not have been determined to force McGrath to forever remain in restricted housing. Therefore, while there appears to be a dispute regarding DeFloria's intent, it is not *material* to this case.

---

**11.** I further note that while McGrath apparently rightfully took advantage of the prison's grievance system, he seems to have never filed a grievance relating to *where* he was housed while at SCI–Pittsburgh.

Plaintiff further alleges that as a result of being put in restrictive housing against his will, he lost certain privileges. Viewing the facts in the light most favorable to plaintiff, the PRC Committee, not plaintiff, determined that McGrath needed to be in restrictive housing. The problem with plaintiff's contention is that he did not bring suit against the members of his PRC Committee.[12]

Plaintiff also devotes considerable time in his brief addressing the fact that for many months his prison records contained a false number of misconducts. Apparently, the error first appeared on McGrath's transfer petition. (Am.Compl., Ex. 3.) Plaintiff alleges that the untrue number of misconducts negatively impacted his October PACT. (Pl.'s Br. at 12.) However, I address the issue in the context of his transfer because as explained above, there is no indication on the re-classification inquiry that the number of misconducts was inaccurate. (Defs.' Ex. D–9.) Further, the error seemed to have occurred on his transfer petition. I conclude that while it is clear from the record that prison records reflected an inaccurate number of misconducts, there is no evidence that the misinformation caused McGrath to be transferred or placed in restricted housing. Thus, plaintiff has failed to raise a *genuine* issue of material fact regarding the impact of his inaccurate records.

Accordingly, I conclude that Defendants are entitled to summary judgement regarding plaintiffs' claim that defendants retaliated against him by transferring him to SCI–Pittsburgh and forcing him into restricted housing.

*Parole Denials*

■ McGrath also alleges that in retaliation for his filing, defendants denied him parole. There are three parole hearings in the record. The first occurred on March 28, 1996, which was clearly before July 17, 1996 when the complaint was filed. Thus, Superintendent Dragovich's recommendation to deny parole, which was based on the fact that at that point McGrath had not yet completed half his set back date, could not have been motivated by retaliatory animus. (Defs.' Ex. D–16.) The second hearing occurred on January 13, 1997. Dragovich again recommended against parole based on the fact that since his last parole, McGrath had incurred a misconduct and not completed any programs. (Pl.'s Ex. 60.) McGrath contends he had completed a program; however, the only evidence he produces is a letter from Western Illinois University indicating that he had *applied* to graduate from the Board of Governors Bachelor of Arts Degree Program, but had outstanding course work to complete to *complete*. (Am.Compl., Ex. 1–C.) McGrath was again denied parole in March of 1997. According to DOC records, this hearing was not fully "staffed" because of the reasons that parole was not recommended at the prior hearings. (Unell Interrog., Defs' Ex. C, ¶ 7.) I conclude that regardless of whether plaintiff could carry his burden, defendants have shown legitimate reasons for recommending against parole. In addition, I note that even if defendants had supported his parole, the ultimate decision lies with the Parole Board.

## IV. Conclusion

For the reasons explained above, I conclude that all defendants are entitled to

12. Further, I note that although both Superintendent Price and prison official Winstead explained to McGrath that the PRC Committee determines privileges, (Am.Compl., Exs. 8,

19), it does not appear from the record that plaintiff ever requested privileges from the PRC committee.

summary judgement for the retaliation claims brought against them by McGrath.