## SHAW ET AL. *v.* MURPHY

No. 99-1613.   Argued January 16, 2001—Decided April 18, 2001

*David L. Ohler*, Special Assistant Attorney General of Montana, argued the cause for petitioners. With him on the briefs were *Joseph P. Mazurek*, Attorney General, and *Diana Leibinger-Koch*, Special Assistant Attorney General.

*Patricia A. Millett* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Waxman, Assistant Attorney General Ogden, Deputy Solicitor General Underwood, Gregory G. Garre, Barbara L. Herwig,* and *John Hoyle.*

*Jeffrey T. Renz* argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Florida et al. by *Robert A. Butterworth*, Attorney General of Florida, *Thomas E. Warner*, Solicitor General, and *Cecilia Bradley*, Assistant Attorney

JUSTICE THOMAS delivered the opinion of the Court.

Under our decision in *Turner* v. *Safley,* 482 U. S. 78 (1987), restrictions on prisoners' communications to other inmates are constitutional if the restrictions are "reasonably related to legitimate penological interests." *Id.,* at 89. In this case, we are asked to decide whether prisoners possess a First Amendment right to provide legal assistance that enhances the protections otherwise available under *Turner.* We hold that they do not.

## I

While respondent Kevin Murphy was incarcerated at the Montana State Prison, he served as an "inmate law clerk," providing legal assistance to fellow prisoners. Upon learning that inmate Pat Tracy had been charged with assaulting Correctional Officer Glen Galle, Murphy decided to assist Tracy with his defense. Prison rules prohibited Murphy's assignment to the case,[1] but he nonetheless investigated the assault. After discovering that other inmates had complained about Officer Galle's conduct, Murphy sent Tracy a letter, which included the following:

General, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Mark Pryor* of Arkansas, *M. Jane Brady* of Delaware, *James E. Ryan* of Illinois, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Thomas F. Reilly* of Massachusetts, *Don Stenberg* of Nebraska, *Philip T. McLaughlin* of New Hampshire, *Heidi Heitkamp* of North Dakota, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, and *Mark L. Earley* of Virginia; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson.*

*Daniel L. Greenberg, John Boston, Elizabeth Alexander, Margaret Winter, David C. Fathi,* and *Stephen Bright* filed a brief for the Legal Aid Society of the City of New York et al. as *amici curiae* urging affirmance.

[1] Tracy had requested that Murphy be assigned to his case. App. 84. Prison officials, however, denied that request because prison policy forbade high-security inmates, such as Murphy, from meeting with maximum-security inmates, including Tracy. App. to Pet. for Cert. 19. Prison officials offered Tracy another law clerk to assist him. App. 84.

"I do want to help you with your case against Galle. It wasn't your fault and I know he provoked whatever happened! Don't plead guilty because we can get at least 100 witnesses to testify that Galle is an over zealous guard who has a personal agenda to punish and harrass *[sic]* inmates. He has made homo-sexual *[sic]* advances towards certain inmates and that can be brought up into the record. There are petitions against him and I have tried to get the Unit Manager to do something about what he does in Close II, but all that happened is that I received two writeups from him myself as retaliation. So we must pursue this out of the prison system. I am filing a suit with everyone in Close I and II named against him. So you can use that too!

"Another poiont *[sic]* is that he grabbed you from behind. You tell your lawyer to get ahold of me on this. Don't take a plea bargain unless it's for no more time." App. 50.

In accordance with prison policy, prison officials intercepted the letter, and petitioner Robert Shaw, an officer in the maximum-security unit, reviewed it. Based on the accusations against Officer Galle, Shaw cited Murphy for violations of the prison's rules prohibiting insolence, interference with due process hearings, and conduct that disrupts or interferes with the security and orderly operation of the institution. After a hearing, Murphy was found guilty of violating the first two prohibitions. The hearings officer sanctioned him by imposing a suspended sentence of 10 days' detention and issuing demerits that could affect his custody level.

In response, Murphy brought this action, seeking declaratory and injunctive relief under Rev. Stat. § 1979, 42 U. S. C. § 1983. The case was styled as a class action, brought on behalf of himself, other inmate law clerks, and other prisoners. The complaint alleged that the disciplining of Mur-

phy violated due process, the rights of inmates to access the courts, and, as relevant here, Murphy's First Amendment rights, including the right to provide legal assistance to other inmates.

After discovery, the District Court granted petitioners' motion for summary judgment on all of Murphy's claims. On the First Amendment claim, the court found that Murphy was not formally acting as an inmate law clerk when he wrote the letter, and that Murphy's claims should therefore "be analyzed without consideration of any privilege that law clerk status might provide." App. to Pet. for Cert. 24. The District Court then applied our decision in *Turner* v. *Safley*, 482 U. S. 78 (1987), which held that a prison regulation impinging on inmates' constitutional rights is valid "if it is reasonably related to legitimate penological interests," *id.*, at 89. Finding a "valid, rational connection between the prison inmate correspondence policy and the objectives of prison order, security, and inmate rehabilitation," the District Court rejected Murphy's First Amendment claim. App. to Pet. for Cert. 25.

The Court of Appeals for the Ninth Circuit reversed. It premised its analysis on the proposition that "inmates have a First Amendment right to assist other inmates with their legal claims." 195 F. 3d 1121, 1124 (1999). Murphy enjoyed this right of association, the court concluded, because he was providing legal advice that potentially was relevant to Tracy's defense. The Court of Appeals then applied our decision in *Turner*, but it did so only against the backdrop of this First Amendment right, which, the court held, affected the balance of the prisoner's interests against the government's interests. Concluding that the balance tipped in favor of Murphy, the Court of Appeals upheld Murphy's First Amendment claim.

Other Courts of Appeals have rejected similar claims. See, *e. g.*, *Gibbs* v. *Hopkins*, 10 F. 3d 373, 378 (CA6 1993) (no constitutional right to assist other inmates with legal

claims); *Smith* v. *Maschner*, 899 F. 2d 940, 950 (CA10 1990) (same); *Gassler* v. *Rayl*, 862 F. 2d 706, 707–708 (CA8 1988) (same). To resolve the conflict, we granted certiorari. 530 U. S. 1303 (2000).

## II

In this case, we are not asked to decide whether prisoners have *any* First Amendment rights when they send legal correspondence to one another. In *Turner*, we held that restrictions on inmate-to-inmate communications pass constitutional muster only if the restrictions are reasonably related to legitimate and neutral governmental objectives. 482 U. S., at 89. We did not limit our holding to nonlegal correspondence, and petitioners do not ask us to construe it that way. Instead, the question presented here simply asks whether Murphy possesses a First Amendment right to provide legal advice that enhances the protections otherwise available under *Turner*. The effect of such a right, as the Court of Appeals described it, 195 F. 3d, at 1127, would be that inmate-to-inmate correspondence that includes legal assistance would receive more First Amendment protection than correspondence without any legal assistance. We conclude that there is no such special right.

Traditionally, federal courts did not intervene in the internal affairs of prisons and instead "adopted a broad hands-off attitude toward problems of prison administration." *Procunier* v. *Martinez*, 416 U. S. 396, 404 (1974). Indeed, for much of this country's history, the prevailing view was that a prisoner was a mere "slave of the State," who "not only forfeited his liberty, but all his personal rights except those which the law in its humanity accords him." *Jones* v. *North Carolina Prisoners' Labor Union, Inc.*, 433 U. S. 119, 139 (1977) (Marshall, J., dissenting) (quoting *Ruffin* v. *Commonwealth*, 62 Va. 790, 796 (1871)) (alterations and internal quotation marks omitted). In recent decades, however, this Court has determined that incarceration does not divest prisoners of all constitutional protections. Inmates

retain, for example, the right to be free from racial discrimination, *Lee* v. *Washington*, 390 U. S. 333 (1968) *(per curiam)*, the right to due process, *Wolff* v. *McDonnell*, 418 U. S. 539 (1974), and, as relevant here, certain protections of the First Amendment, *Turner, supra.*

We nonetheless have maintained that the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large. In the First Amendment context, for instance, some rights are simply inconsistent with the status of a prisoner or "with the legitimate penological objectives of the corrections system," *Pell* v. *Procunier*, 417 U. S. 817, 822 (1974). We have thus sustained proscriptions of media interviews with individual inmates, see *id.*, at 833–835, prohibitions on the activities of a prisoners' labor union, see *North Carolina Prisoners' Labor Union, Inc., supra*, at 133, and restrictions on inmate-to-inmate written correspondence, see *Turner, supra*, at 93. Moreover, because the "problems of prisons in America are complex and intractable," and because courts are particularly "ill equipped" to deal with these problems, *Martinez, supra*, at 404–405, we generally have deferred to the judgments of prison officials in upholding these regulations against constitutional challenge.

Reflecting this understanding, in *Turner* we adopted a unitary, deferential standard for reviewing prisoners' constitutional claims: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U. S., at 89. Under this standard, four factors are relevant. First and foremost, "there must be a 'valid, rational connection' between the prison regulation and the legitimate [and neutral] governmental interest put forward to justify it." *Ibid.* (quoting *Block* v. *Rutherford*, 468 U. S. 576, 586 (1984)). If the connection between the regulation and the asserted goal is "arbitrary or irrational," then the regulation fails, irrespective of whether the other factors tilt in its

favor. 482 U. S., at 89–90. In addition, courts should consider three other factors: the existence of "alternative means of exercising the right" available to inmates; "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and "the absence of ready alternatives" available to the prison for achieving the governmental objectives. *Id.,* at 90.

Because *Turner* provides the test for evaluating prisoners' First Amendment challenges, the issue before us is whether *Turner* permits an increase in constitutional protection whenever a prisoner's communication includes legal advice. We conclude that it does not. To increase the constitutional protection based upon the content of a communication first requires an assessment of the value of that content.[2] But the *Turner* test, by its terms, simply does not accommodate valuations of content. On the contrary, the *Turner* factors concern only the relationship between the asserted penological interests and the prison regulation. *Id.,* at 89.

Moreover, under *Turner* and its predecessors, prison officials are to remain the primary arbiters of the problems that arise in prison management. *Ibid.;* see also *Martinez, supra,* at 405 ("[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform"). If courts were permitted to enhance constitutional protection based on their assessments of the content of the particular communications, courts would be in a position to assume a greater role in decisions affecting prison administration. Seeking to avoid " 'unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration,' " *Turner,* 482 U. S., at 89 (quoting *Martinez, supra,* at 407) (alteration in original), we reject

---

[2] The Court of Appeals made such an assessment when it " 'balance[d] the importance of the prisoner's infringed right against the importance of the penological interest served by the rule.' " 195 F. 3d 1121, 1127 (CA9 1999) (quoting *Bradley* v. *Hall,* 64 F. 3d 1276, 1280 (CA9 1995)).

an alteration of the *Turner* analysis that would entail additional federal-court oversight.

Finally, even if we were to consider giving special protection to particular kinds of speech based upon content, we would not do so for speech that includes legal advice.[3] Augmenting First Amendment protection for inmate legal advice would undermine prison officials' ability to address the "complex and intractable" problems of prison administration. *Turner, supra,* at 84. Although supervised inmate legal assistance programs may serve valuable ends, it is "indisputable" that inmate law clerks "are sometimes a menace to prison discipline" and that prisoners have an "acknowledged propensity . . . to abuse both the giving and the seeking of [legal] assistance." *Johnson* v. *Avery,* 393 U. S. 483, 488, 490 (1969). Prisoners have used legal correspondence as a means for passing contraband and communicating instructions on how to manufacture drugs or weapons. See Brief for State of Florida et al. as *Amici Curiae* 6–8; see also *Turner, supra,* at 93 ("[P]risoners could easily write in jargon or codes to prevent detection of their real messages"). The legal text also could be an excuse for making clearly inappropriate comments, which "may be expected to circulate among prisoners," *Thornburgh* v. *Abbott,* 490 U. S. 401, 412 (1989), despite prison measures to screen individual inmates or officers from the remarks.

We thus decline to cloak the provision of legal assistance with any First Amendment protection above and beyond the protection normally accorded prisoners' speech. In-

---

[3] Murphy suggests that the right to provide legal advice follows from a right to receive legal advice. However, even if one right followed from the other, Murphy is incorrect in his assumption that there is a free-standing right to receive legal advice. Under our right-of-access precedents, inmates have a right to receive legal advice from other inmates only when it is a necessary "means for ensuring a 'reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Lewis* v. *Casey,* 518 U. S. 343, 350–351 (1996) (quoting *Bounds* v. *Smith,* 430 U. S. 817, 825 (1977)).

stead, the proper constitutional test is the one we set forth in *Turner*. Irrespective of whether the correspondence contains legal advice, the constitutional analysis is the same.

### III

Under *Turner*, the question remains whether the prison regulations, as applied to Murphy, are "reasonably related to legitimate penological interests." 482 U. S., at 89. To prevail, Murphy must overcome the presumption that the prison officials acted within their "broad discretion." *Abbott, supra*, at 413. Petitioners ask us to answer, rather than remand, the question whether Murphy has satisfied this heavy burden. We decline petitioners' request, however, because we granted certiorari only to decide whether inmates possess a special First Amendment right to provide legal assistance to fellow inmates.

\*     \*     \*

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE GINSBURG, concurring.

I agree with the Court that the Ninth Circuit erred in holding that the First Amendment secures to prisoners a freestanding right to provide legal assistance to other inmates. I note, furthermore, that Murphy does not contest the prison's right to intercept prisoner-to-prisoner correspondence. But Murphy's § 1983 complaint does allege that the prison rules under which he was disciplined—rules forbidding insolence and interference with due process hearings—are vague and overbroad as applied to him in this case.\* The Ninth Circuit passed over that charge when it

---

\*The rule forbidding insolence defines "insolence" as "[w]ords, actions or other behavior which is *intended* to harass or cause alarm in an employee." Mont. State Prison Policy No. 15–001, Inmate Disciplinary Pol-

ruled, erroneously, that an inmate's provision of legal assistance to another inmate is an activity specially protected by the First Amendment. 195 F. 3d 1121, 1128 (1999). The remand for which the Court provides should not impede Murphy from reasserting claims that the Court of Appeals so far has left untouched.

---

icy, Rule 009 (App. 10) (emphasis added). The policy includes the following examples of insolence: "Cursing; abusive language, writing or gestures *directed to* an employee." *Ibid.* (emphasis added). The disciplinary report citing Murphy for violating the rule against insolence contains no finding that Murphy's letter was "directed to" Officer Galle or that the letter was "intended to harass" Officer Galle. App. 52. Although Murphy undoubtedly knew that his letter to Tracy would be read by prison officials, there is no record evidence contesting Murphy's sworn statement that he "did not believe that Officer Galle would read the letter." Murphy Affidavit ¶ 10 (App. 88).