**Charles ISELEY, Petitioner**

v.

**Jeffrey BEARD, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Dec. 19, 2003.

Decided Jan. 23, 2004.

Charles Iseley, petitioner, pro se.

John J. Talaber, Camp Hill, for respondent.

BEFORE: PELLEGRINI, Judge, and SIMPSON, Judge, and MIRARCHI, Jr., Senior Judge.

OPINION BY Judge PELLEGRINI.

■ Before this Court are cross-motions for summary relief[1] filed by both Jeffrey Beard (Secretary Beard), Secretary of the Commonwealth of Pennsylvania, Department of Corrections (Department), and Charles Iseley (Iseley), who has also filed a petition for review in the nature of mandamus against Secretary Beard questioning the denial of grievances he filed concerning certain publications that he was not allowed to have in his prison cell.

Iseley is an inmate currently incarcerated at the State Correctional Institution at Pittsburgh (SCI–Pittsburgh) housed in the Long Term Segregation Unit (LTSU)[2] at

---

1. Summary relief may only be granted if the right of the applicant is clear. *See* Pa. R.A.P. 1532(b). Where the parties have filed cross-motions for summary relief, the Court must determine whether it is clear from the undisputed facts that one of the parties has established a clear right to the relief requested. *See Gelnett v. Department of Transportation,* 670 A.2d 217 (Pa.Cmwlth.1996); *McGriff v. Board of Probation and Parole,* 149 Pa. Cmwlth. 638, 613 A.2d 688 (1992).

2. The Department's maximum security housing is divided into three different leveled units: (1) Restricted Housing Unit (RHU); (2) Special Management Unit (SMU); and (3) the LTSU. LTSU is the most restrictive; specifically, it is an area consisting of maximum security housing coupled with extremely limited programming and privileges designed for high-risk inmates.

level three.[3] As an inmate in LTSU at level three,[4] Iseley was restricted from receiving newspapers and publications and was only allowed one box of legal material in his cell at any given time. As a result, beginning on March 12, 2003, Iseley filed five grievances[5] challenging the ban on the incoming publications and the excess property: Grievance number 46601; Grievance number 46600; Grievance number 49695; Grievance number 51793; and Grievance number 62413.[6] The first three grievances were denied because department policy limited Iseley's in-cell property to one records center box, and he was told that in accordance with policy, he had the option to mail his excess property out at his own expense or to have it destroyed. In the fourth grievance, Grievance number 51793, Iseley claimed that the excess property constituted "legal exhibits" and,

therefore, should not be destroyed. In response to this grievance, Iseley was informed that his property needed to be in compliance with department policy and that he should contact his unit management team if he wanted a waiver. Iseley did not send the property out at his own expense. Iseley appealed the denial of each of the grievances to the superintendent of the prison who denied each of the appeals except for the fifth grievance, Grievance number 62413, which appeal is still pending. Iseley did not, however, appeal the denial of any of these appeals to the chief grievance officer of the Department for final review within the Department.

Instead, on April 23, 2003, Iseley filed a petition for review with this Court seeking a writ of mandamus[7] directing

3. The LTSU Program has four levels: Level 4, the highest level, where all inmates are placed for 90 days upon entering the LTSU; Level 3, where inmates are placed after 90 days, and at which time, the inmate's behavior is continuously evaluated; Level 2, which an inmate is placed in based on his or her good behavior; and Level 1, where an inmate may move if he is not actively disruptive and has completed the prescriptive programming outline.

4. Each level of the LTSU provides different confinement and privileges. In particular, at Levels 3 and 4, the privileges include the following:
   (1) One non-contact, immediate family only visit per month;
   (2) In-cell counseling services;
   (3) One hour of outdoor yard recreation five days a week;
   (4) Two recreational books per week and legal law library services;
   (5) Legal and personal correspondence (that fits into one records center box);
   (6) In-cell religious visits by a Chaplain; and
   (7) Three showers per week.

5. The Department maintains a prisoner grievance system which allows prisoners to seek review of problems which they experience

during their period of incarceration. According to the system, a prisoner files an initial grievance with the prison staff. He can then appeal that decision to the superintendent of the prison and, as a final appeal within the Department, a prisoner may appeal the grievance to the chief grievance officer of the Department. See Inmate Handbook, 2003 Edition, Reproduced Record at 115–117. Copies of the grievance system procedures are made available to every prisoner in their Inmate Handbook under the Department's jurisdiction. See 37 Pa.Code § 93.9.

6. The original grievances were filed according to the Department's formal grievance policy for reviewing and resolving all inmate grievances. See Inmate Handbook, 2003 Edition, Reproduced Record at 115–117.

7. Mandamus is an extraordinary remedy that compels the official performance of a ministerial act or a mandatory duty. See McGriff v. Board of Probation and Parole, 809 A.2d 455 (Pa.Cmwlth.2002). The purpose of mandamus is not to establish legal rights, but to enforce those rights which are already established. Waters v. Department of Corrections, 97 Pa.Cmwlth. 283, 509 A.2d 430 (1986). To obtain a writ of mandamus, a petitioner must demonstrate: (1) a clear legal right in the

Secretary Beard to give him his confiscated publications and permit him to receive and possess publications via mail. After various procedural matters were resolved and the pleadings were closed,[8] both parties filed motions for summary relief. In his motion for summary relief, Iseley claims for a number of reasons [9] that Secretary Beard has a non-discretionary duty to return the confiscated publications as well as allow him to receive and possess

publications via mail. In Secretary Beard's and the Department's motion for summary relief, they contend that Iseley has not set out a claim for mandamus both because he has not exhausted his inmate grievance procedure and because he does not have the right to the keep all of the materials that he wants in his cell nor the right to receive all of the publications that he desires to receive.

petition; (2) a corresponding duty in respondent; and (3) absence of any appropriate or adequate remedy. *See Equitable Gas Company. v. City of Pittsburgh*, 507 Pa. 53, 488 A.2d 270 (1985) (also finding that the petitioner must show an immediate, specific, well-defined and complete legal right to the thing demanded.)

8. By order dated April 28, 2003, we directed that this matter should be treated as a petition for review addressed to this Court's original jurisdiction and directed Secretary Beard to file an answer or otherwise plead on or before May 28, 2003. On May 23, 2003, Secretary Beard filed preliminary objections to the petition for review. On June 12, 2003, Iseley filed an application for summary relief with a supporting brief again requesting this Court to direct Secretary Beard to allow him to receive and possess his publications. On August 15, 2003, Secretary Beard sought leave of court to withdraw his preliminary objections and file an answer with affirmative defenses.

9. Iseley included the following questions in his brief:

1.) Does petitioner have a federal entitlement to receive and possess incoming publications?

2.) Does petitioner have a state entitlement to receive and possess incoming publications?

3.) Does petitioner have a state regulation entitlement to receive and possess incoming publications;

4.) Does Petitioner have an agency bulletin entitlement to receive and possess incoming publications?

5.) Does Petitioner have an agency policy entitlement to receive and possess incoming publications?

6.) Does Petitioner have an agency handbook entitlement to receive and possess publications?

7.) Does Petitioner have an agency facility handbook entitlement to receive and possess publications?

8.) Does Petitioner have a facility unit part handbook entitlement to receive and possess publications?

9.) Is the Turner Standard applicable for denial of incoming publications?

10.) Is the publication ban rationally connected to a legitimate government objective?

11.) Does Petitioner have an alternative means to receive and possess his incoming publication subscriptions?

12.) Would the accommodation of Petitioner's asserted rights cause an inconsequential impact?

13.) Is the ban on incoming publications an exaggerated response?

14.) Does the incoming publications ban fail the Turner Standard?

15.) Does the incoming publications ban violate the establishment clause?

16.) Does the incoming publications ban violate equal protection?

17.) Was Petitioner retaliated against for exercising his rights?

18.) Was the deprivation of incoming publications a violation of Administrative Law?

19.) Was the deprivation of incoming publications a conversion tort?

20.) Should Respondent's cross-motion for summary relief be denied?

21.) Is Petitioner entitled to summary relief?

Iseley's Brief, at 5–6.

To make out a claim in mandamus, Iseley would have had to set forth a claim that while residing in LTSU, Secretary Beard and the Department had a non-discretionary duty to allow him to retain more than one box of legal materials and to allow him to receive various publications by mail. Iseley would have also had to prove that he had no other appropriate remedy other than mandamus.

As to whether Iseley has set forth a claim, in *Bronson v. Central Office Review Committee*, 554 Pa. 317, 721 A.2d 357 (1998), our Supreme Court dealt with the issue of in what situations, when and what kind of claims could a mandamus action be brought against the Department by a prisoner. In holding that those claims could only be brought if the prisoner presented substantial constitutional issues, the prisoner had filed an inmate grievance, and he or she had exhausted internal administrative appeals, the Court stated:

> [I]nternal prison operations are more properly left to the legislative and executive branches, and ... prison officials must be allowed to exercise their judgment in the execution of policies necessary to preserve order and maintain security free from judicial interference. [Citation omitted.] We agree. Unlike the criminal trial and appeals process where a defendant is accorded the full spectrum of rights and protections guaranteed by the state and federal constitutions, and which is necessarily within the ambit of the judiciary, the procedures for pursuing inmate grievances and misconduct appeals are a matter of internal prison administration and the "full panoply of rights due a defendant in a criminal prosecution is not necessary in a prison disciplinary proceeding...."

\* \* \*

Prison inmates do not enjoy the same level of constitutional protections afforded to non-incarcerated citizens. As the *Robson* court observed, "incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." [Citation omitted.] Unless "an inmate can identify a personal or property interest ... not limited by Department [of Corrections] regulations and **which has been affected by a final decision of the department**" the decision is not an adjudication subject to the court's review. [Citation omitted.] (Emphasis added.)

*Bronson*, 554 Pa. at 321, 323, 721 A.2d at 358–359.

In this case, Iseley filed five grievances, four of which he pursued up to the level of the superintendent of SCI Pittsburgh, and the fifth is still pending. Although Iseley could have appealed the denial by the superintendent further through the established inmate grievance procedure, he admits that he elected not to do so. Because Iseley's inmate grievances were not or have not been pursued to finality, his constitutional claims have not ripened and, consequently, he has not set forth a non-discretionary act which the Department has failed to perform.

Assuming that such a claim was cognizable in mandamus, to the extent that Iseley is making a constitutional claim challenging the policies regarding the receiving of publications and possession of more legal papers than one box rather than how those procedures apply to him, he would still have to prove that those restrictions do not serve a legitimate penological interest.[10] In *Small v. Horn*, 554

10. The other two constitutional violations asserted in Iseley's brief include a violation of

Pa. 600, 722 A.2d 664 (1998), our Supreme Court addressed the revocation of an inmate's permission to wear civilian clothing. In rejecting a claim that department bulletins created an enforceable right, the Court said:

> Because of the unique nature and requirements of the prison setting, imprisonment "carries with it the circumscription or loss of many significant rights ... to accommodate a myriad of institutional needs ... chief among which is internal security." [Citation omitted.] Accordingly, the Department must enforce reasonable rules of internal prison management to ensure public safety and prison security. These rules must be modified as conditions change, different security needs arise, and experience brings to light weaknesses in current security measures.

*Small*, 554 Pa. at 610–611, 722 A.2d at 669–670.

■■■ Just because the Department promulgates a policy does not mean that it is automatically valid. As the United Supreme Court stated in *Shaw v. Murphy*, 532 U.S. 223, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001): "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 229, 121 S.Ct. 1475 (quoting *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). In *Shaw*, the Court set forth four factors that should be considered:

> First and foremost, "there must be a 'valid, rational connection' between the prison regulation and the legitimate [and neutral] governmental interest put forward to justify it." ... If the connection between the regulation and the asserted goal is "arbitrary or irrational," then the regulation fails, irrespective of whether the other factors tilt in its favor.... In addition, courts should consider three other factors: the existence of "alternative means of exercising the right" available to inmates; "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and "the absence of ready alternatives" available to the prison for achieving the governmental objectives.

*Shaw*, 532 U.S. at 229–230, 121 S.Ct. 1475. (Citations omitted.) *See also Bronson v. Horn*, 830 A.2d 1092, 1095 (Pa.Cmwlth. 2003).

---

the Establishment Clause and a violation of the Equal Protection Clause. The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. The clause applies to state governments through the Fourteenth Amendment. *Ross v. Keelings*, 2 F.Supp.2d 810 (E.D.Va.1998). In this case, even though the Department has restricted all publication but religious publication to LTSU inmates at levels 3 and 4, that action does not amount to state coercion of religion because inmates are not required to receive or read religious publications, but rather may read those publications if they choose. *See Ross*, 2 F.Supp.2d at 818.

Iseley also claims that because other inmates in the custody of the Department are not banned from receiving publications and he is, he is being denied the equal protection of the laws because he is denied the same privileges those inmates in lower level security units receive. What that argument ignores is that the Equal Protection Clause of the Fourteenth Amendment only requires that all persons similarly situated should be treated alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Iseley is placed in a separate LSTU level 3 unit because of his behavior while incarcerated making the privileges that inmates receive in lower level security units irrelevant because he is not similarly situated.

In this case, the legitimate and neutral governmental interest put forward by Secretary Beard to justify the publication ban are the goals of rehabilitation and prison security. The Department is responsible for providing programs and services, safety and security to almost 40,000 incarcerated persons in the Commonwealth. (Reproduced Record at 64–71, 88–94.) Because the restrictions imposed under the LTSU policy are a non-violent form of behavior modification used to teach inmates to follow basic orders and behave in a safe and acceptable way, are necessary to reduce the risk of flammable materials to be placed in the cell, are used to limit the exchange of contraband between inmates on the LTSU, to take away resources for potential weapons the inmates can make, and to limit an inmate's ability to conceal contraband in their cell, (Reproduced Record at 30–32), and all inmates in LTSU units level 3 and 4 are subject to the restriction on receiving publications, there is a valid, rational connection between the prison regulation and the legitimate and neutral governmental interest put forward by Secretary Beard to justify the publication ban.

Also, because Iseley still retains limited visitation rights, outdoor yard time, the ability to access both recreational and legal libraries, the right to receive religious publications, legal materials and personal correspondence, and the right to a visitation from a prison chaplain for whatever faith he practices, Iseley also has alternative means of exercising his First Amendment rights. As the purpose of the LTSU program is to modify behavior through rewarding good behavior, lifting the publication ban for Iseley would minimize that purpose and weaken the Department's ability to maintain a safe environment. Finally, because of the absence of available ready alternatives that would continue the policy goal, it must be concluded that the Department's ban on publications is constitutionally acceptable.[11]

For the same reasons that we find that Iseley's petition for writ of mandamus against Secretary Beard must be dismissed, we also find that it is appropriate to grant Secretary Beard's motion for summary relief. Accordingly, Iseley's petition for review seeking a writ of mandamus is dismissed; his motion for summary relief is denied; and Secretary Beard's cross-motion for summary relief is granted.

### ORDER

AND NOW, this *23rd* day of *January*, 2004, Charles Iseley's petition for review seeking a writ of mandamus is dismissed and his motion for summary relief is denied. The cross-motion for summary relief filed by Jeffrey Beard, Secretary of the Commonwealth of Pennsylvania, Department of Corrections, is granted.

---

11. Regarding Iseley's claim that he has a right to possess excess property, specifically, legal documents in an amount greater than what the Department provides, "limitations ... on materials, including legal materials, that may be kept in an inmate's cell are reasonably related to the legitimate penological goals of safety, security and fire hazard concerns." *Hackett v. Horn,* 751 A.2d 272, at 275 (Pa.Cmwlth.2000).