**Cookish et al. v. Rouleau et al.     CV-02-526-B  03/11/04**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE


**Dennis R. Cookish & Michael Donovan**

    **v.**                                        Civil No. 02-526-B
                                          Opinion No. 2004 DNH 045
**Angela Rouleau, et. al.**


### MEMORANDUM AND ORDER

Plaintiffs Dennis R. Cookish and Michael Donovan, both incarcerated inmates at the Northern New Hampshire Correctional Facility ("NCF") in Berlin, NH, bring a claim for equitable relief and damages pursuant to 42 U.S.C. § 1983 against defendants Angela Rouleau, Bruce Cattell, Philip Stanley, and John Vinson, in their individual and official capacities.[1] Plaintiffs claim that the defendants have denied them meaningful access to the courts. In particular, they challenge the prison library's photocopy policy, the way in which it hires and uses inmate law clerks, the adequacy of the law library's reference

---

[1] Angela Rouleau has recently married and changed her name. I refer to her by her maiden name throughout this order. Rouleau is the prison librarian, Cattell is the warden, Stanley is the commissioner, and Vinson is the prison's in-house counsel.

materials and the way in which law library time is allocated to inmates. The parties have filed competing motions for summary judgment. I deny plaintiffs' motion and grant defendants' motion.

## I. FACTS[2]

Plaintiffs assert the policies and practices of the prison impermissibly deny them meaningful access to the courts. They separate the policies and practices into four categories: (1) the prison's photocopying policy; (2) its hiring and use of inmate law clerks; (3) the adequacy of the law library; and (4) the allocation of law library time to inmates. I lay out the factual background of each in turn.

### A. Photocopy Policy

Plaintiffs first argue the prison's photocopy policy infringes their right of access to the courts. The photocopy machine is located in Rouleau's office and any legal material

---

[2] In evaluating motions for summary judgment, I describe the facts in the light most favorable to the nonmoving party. Because I have granted defendants' motion for summary judgment, I describe the facts in the light most favorable to the plaintiffs.

that an inmate wishes to have copied must be given to Rouleau.[3] Rouleau does not read documents that are submitted for copying but she does inspect them for staples or crumpled paper that could damage the copier. She also confiscates documents that upon cursory review appear to be contraband items. Any confiscated documents are reviewed in depth and, if determined to be benign, are returned to the inmate. One such incident occurred when Cookish attempted to have a town's voter checklist photocopied as part of an action he was preparing to file in state court. Rouleau seized the document and had it reviewed before returning it to Cookish three days later after it was determined that Cookish could properly have the voter checklist. Likewise, inmates are not allowed to possess the property of another, and when Cookish tried to photocopy public files relating to other inmates, the documents were seized until it was determined that Cookish was entitled to use them for his own research purposes.

---

[3] Cookish and Donovan allege that Rouleau impermissibly reads privileged and confidential legal materials when she reviews documents submitted for copying. The record, however, contains no evidence to support these conclusory claims.

3

Photocopying at the law library is not "on demand."  Rather, all documents submitted for copying are required to be copied within 24 hours.  Most copies, however, are completed and returned to inmates within a few minutes to a few hours.  Photocopying is not free.  Inmates must pay 10¢ for each side of a page that is copied, regardless of how much copying an inmate requires.[4]  The cost of copies is deducted from an inmate's account.  If an account has insufficient funds, the Inmate Accounts Office notifies the photocopy service provider office to cease photocopy service to that inmate until the shortage is made up.  The Inmate Accounts Office then automatically withdraws the shortage from the inmate's next monthly pay and notifies the inmate of such action.

B.   **Inmate Law Clerks**

Plaintiffs next challenge the prison's hiring policy and its use of inmate law clerks.  The prison has a standing policy that inmates using the law library are not to assist each other without the warden's approval and are to conduct their research quietly and independently.  Rouleau employs two inmate law clerks

---

[4]  Outside parties are charged 50¢ per page.

who assist her in guiding inmates to find what they need in the law library. These inmate law clerks, however, may not give legal advice or conduct research for others. In hiring inmate law clerks, legal research proficiency is desirable, but a priority is placed on penologically important qualifications such as good conduct, work ethic, and a lack of security issues. If an inmate law clerk is unable to assist an inmate, Rouleau can assist him.

Cookish applied for an inmate law clerk position but was not hired despite his legal research experience. Cookish cited his previous experience as an inmate law clerk at a different New Hampshire state prison and two and a half years of legal study at the Nova University College of Law on his application. Nevertheless, Rouleau did not hire Cookish as an inmate law clerk because she claimed that the positions were already filled. In an affidavit submitted with her motion for summary judgment, Rouleau also cited Cookish's tendency to not follow prison regulations by dispensing legal advice as another reason why he was not hired. Cookish has admitted to assisting at least one other inmate in preparing and drafting legal pleadings.

5

Plaintiffs also complain that inmate law clerks are untrained in finding the law and are unable to give legal advice or prepare legal pleadings for inmates.

## C.    Research Materials

Plaintiffs next challenge the adequacy of the prison law library. The NCF law library has a combination of law books and computers with research tools installed on them. Near the end of 2001, the law library began to shift away from hardbound books toward a computer based system. Prior to that time, law books were supplemented with various subscription services to keep them current. When some of the subscription services lapsed, updated legal material became available under Loislaw[5] on the inmate law library computers, with the librarian's computer having an internet connection and expanded access to Loislaw. The library still has some hardbound books, such as Federal Jury Practice and Instructions, Jury Instructions, and Federal Practice and Procedure, just to list a few items from the library's inventory.

---

[5] Loislaw is a computer based legal research system available on computer disk or the internet. Loislaw offers access to a range of legal materials, ranging from federal and state court opinions, to federal and state law, to federal and state court rules. The scope of available legal material is limited by the type of Loislaw subscription a patron has.

Inmates have access to both state and federal law under the Loislaw system, including, but not limited to, New Hampshire Rules of Evidence, Practice and Procedure, New Hampshire statutes and case law, federal Circuit Court opinions, U.S. Supreme Court opinions, Federal Rules of Civil and Appellate Procedure, and Local Rules of Procedure. The U.S. Code is available on Loislaw through the librarian.[6] If Rouleau is unable to find what an inmate needs, the inmate can fill out a request form and Rouleau can pass on the request to the main prison library, the inmate attorney, the prison's in-house counsel, or even the New Hampshire Supreme Court library. Inmate law clerks are trained in the use of Loislaw and Loislaw instruction booklets are available to inmates.

On at least one occasion, Cookish requested two cases from Rouleau and was provided with copies of both cases. He also requested a copy of the Prison Litigation Reform Act, 42 U.S.C. § 1997, the Civil Rights Act, 42 U.S.C. § 1983, and the Federal

---

[6] During the transition from hardbound books toward a computer based system, the pocket part for 42 U.S.C. § 1983 disappeared from the law library. Inmates, however, could obtain any updated information via requests to the law librarian who would obtain the information from other sources.

Communications Act, 47 U.S.C. § 151, with all of their annotations. Rouleau attempted to fulfill this request by requesting copies of the relevant material from the New Hampshire Supreme Court library. She, however, eventually denied his request as overly broad after she was informed that it would require copying and shipping more than 380 pages for just one of the statutes and its corresponding annotations, something the New Hampshire Supreme Court library was not prepared to do. Cookish did nothing to narrow his request after this problem was explained to him. The library has since acquired a copy of the Prison Litigation Reform Act.

**D. Library Scheduling**

The final policy the plaintiffs challenge is the law library's scheduling policy. Inmates are allowed access to the law library once per week for four hours, and the librarian schedules inmate appointments weekly per prison policy. Inmates who fail to keep their library appointments, or fail to cancel them, are subject to disciplinary action. Cookish had his scheduled library visits changed from Thursdays to Mondays in June, 2003. This change effectively stopped Cookish from going

8

to the library for a week because there was no Thursday in the last week of June and no Monday in the first week of July (6/27/03-7/5/03), a total of 8 days. Cookish claims that when he questioned Rouleau about this change, he was told he would only receive four library visits a month, not one visit every week. This would effectively deprive him of four library visits a year, since a visit every week results in 52 visits a year, while four visits a month only results in 48 visits a year.

## II. <u>STANDARD OF REVIEW</u>

Summary judgement is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986). A material fact is one that affects the outcome of the suit. <u>See</u> <u>id.</u> at 248.

9

In ruling on a motion for summary judgment, I must construe the evidence in the light most favorable to the nonmovant. See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001). The party moving for summary judgment, however, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citing Celotex, 477 U.S. at 323; Anderson, 477 U.S. at 249). Neither conclusory allegations, improbable inferences, or unsupported speculation are sufficient to defeat summary judgment. See Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir. 2002).

## III. ANALYSIS

Plaintiffs' claims hinge on the extent to which the

challenged policies impede their access to the courts. "It is undisputed that inmates have a fundamental constitutional right of access to the courts." Carter v. Fair, 786 F.2d 433, 435 (1st Cir. 1986) (citing Bounds v. Smith, 430 U.S. 817, 828 (1977)). This right of access, however, only "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Bounds, 430 U.S. at 828. In order to make a claim that this right of access has been denied, an inmate "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." Lewis v. Casey, 518 U.S. 343, 351 (1996). The right of access "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." Christopher v. Harbury, 536 U.S. 403, 415 (2002). It therefore "follows that the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." Id.

11

It is important to note that because the touchstone is meaningful access to the courts, "prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" Lewis, 518 U.S. at 351 (quoting Bounds, 430 U.S. at 825). "Because Bounds did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." Id. Therefore, in order for the plaintiffs to assert a violation of their constitutional right of meaningful access to the courts under Bounds and its progeny, they must "demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded" by the policies and practices of the prison authorities. Lewis 518 U.S. at 353; see also Christopher, 536 U.S. at 413-15.

A prison regulation or practice may interfere with a fundamental constitutional right of access to the courts if the challenged regulation or practice bears a rational relation to

12

legitimate penological interests.  See Overton v. Bazzetta, 123 S.Ct. 2162, 2167 (2003); Lewis, 518 U.S. at 361; Savard v. Rhode Island, 338 F.3d 23, 30-31 (1st Cir. 2003).  Thus, even if plaintiffs are able to establish that the policies that they challenge actually impeded their access to the courts with respect to a specific claim or claims, they are not entitled to relief if the policies satisfy this requirement.  As I explain below, plaintiffs' claims fail both because they cannot prove that the challenged policies actually impeded their ability to litigate specific claims and because the policies are rationally related to legitimate penological interests.

**A.   Photocopy Policy**

Although plaintiffs clearly are unhappy with the prison's photocopy policy, they have not established that the policy materially impeded their ability to litigate any specific claim.  As I have explained, this defect is fundamental and it necessarily defeats their claim.  Even if plaintiffs could overcome this hurdle, however, they still could not succeed because the prison photocopy policy does not materially burden their ability to access the courts as a general matter and the policy is rationally related to legitimate penological interests.

13

### 1. Photocopying By Librarian

Requiring inmates to temporarily hand over legal materials to the librarian for up to 24 hours for photocopying does not materially affect an inmate's ability to access the courts as a general matter.  "[I]t would be unrealistic to expect prison authorities to give all prisoners unfettered access to all of their legal materials at all times."  Sowell v. Vose, 941 F.2d 32, 35 (1st Cir. 1991).  "[W]here a prisoner . . . does not allege an absolute deprivation of access to all of his legal materials, but rather complains about some sort of conditional restriction of access to some of them, [I] think it fair to require him to show an 'actual injury' as a prerequisite to recovery."  Id.  Losing access to legal materials for up to 24 hours while they are copied by the librarian can hardly be construed as an absolute denial of access to all legal materials.

More importantly, no actual injury has been shown by plaintiffs stemming from this policy.  Even when questionable documents are seized by the librarian, they are readily returned if Rouleau determines that they are not contraband items.  When Cookish had documents temporarily seized by Rouleau after submitting them for photocopying, the documents were returned to

14

Cookish within three days. Cookish has not shown that this three-day seizure of his documents caused him to miss a filing deadline or otherwise impede his ability to access the courts with respect to any specific claim. Under the circumstances, this delay was not unreasonable. See, e.g., Lewis, 518 U.S. at 362 (16 day delay in accessing legal material allowed); Vigliotto v. Terry, 873 F.2d 1201, 1202 (9th Cir. 1989) (three-day deprivation of legal materials not a constitutional deprivation).

Plaintiffs also assert that the prison photocopy policy allows Rouleau to impermissibly review and read legal documents submitted for photocopying. Plaintiffs seem to base this argument on an assertion of privacy rights in the legal materials submitted for photocopying. Plaintiffs, however, are inmates, and as such have only limited privacy rights. See Stow v. Grimaldi, 993 F.2d 1002 (1st Cir. 1993) (prison policy of inspecting prisoners' non-privileged outgoing mail found permissible because it furthered the important governmental interest of security and was a minimal limitation on prisoners' First Amendment rights); Warburton v. Goord, 14 F. Supp. 2d 289, 293 (W.D.N.Y. 1998) (prison officials searching an inmate's law library desk, typewriter memory, and a crate containing legal

15

materials found to not violate inmate's privacy rights nor deny inmate access to the courts).[7]

Additionally, requiring the librarian to review all documents submitted for photocopying is reasonably related to a legitimate penological interest. All documents to be photocopied are checked for staples, crumpled pages, tape, or other defects which might damage the photocopier. Ensuring that the copy machine is not damaged and remains of use to the inmates is a legitimate penological interest. Also, preventing inmates from using the copier for illegal activities or for other activities that may pose a security risk or impact on public safety, is clearly related to a penological interest. Therefore, even if plaintiffs could establish that the photocopy policy interfered with their abilities to exercise their right to access the courts, it is still valid under Overton because it is reasonably related to a legitimate penological interest.

---

[7] Plaintiffs do not argue that the documents at issue are protected by the work product privilege. Further, because plaintiffs have not identified any evidence suggesting that Rouleau or any of the other defendants have used the photocopying policy to review documents that are protected by the attorney-client privilege, I need not speculate about whether the policy would permit Rouleau to read privileged documents.

16

## 2. Photocopy charges

Plaintiffs claim the policy of charging 10¢ per side of each page copied also deprives them of meaningful access to the courts. Once again, however, the plaintiffs fail to explain how they have been actually injured by this policy. Prisons are not required to provide free, unlimited photocopy services to all inmates. Wanninger v. Davenport, 697 F.2d 992, 994 (11th Cir. 1983) ("We agree with the Tenth and Third Circuits that jail officials do not necessarily have to provide a prisoner with free, unlimited access to photocopies of legal precedents in order to protect the prisoner's right to access to the courts."). "The prisoner's right of access to the courts may be balanced against the State's legitimate interests, including budgetary concerns . . . . The State should not be forced to provide free access to copier machines for prisoner use when there is an acceptable, less costly substitute." E.g., Gittens v. Sullivan, 670 F. Supp. 119, 122 (S.D.N.Y. 1987) aff'd, Gittens v. Sullivan, 848 F.2d 389 (2d Cir. 1988). Since prisons need not provide free, unlimited copies, it is reasonable for the prison to charge a small fee for providing and maintaining the copy service. Such a fee is reasonably related to the legitimate penological

17

interest of providing inmates with services while minimizing state budgetary expenses.  Here, all proceeds taken in for copies are returned to the inmate Recreation Fund to continue support of equipment and supplies for the inmates, further advancing a legitimate interest of maintaining adequate recreational equipment for inmates.  Therefore, even if plaintiffs could demonstrate an actual injury stemming from the 10¢ copy fee, the fee is permissible because it is reasonably related to a legitimate penological interest.[8]

## B.   Inmate Law Clerks

Plaintiffs next contend that the prison impermissibly hires under-qualified inmates while refusing to hire inmates such as Cookish who have a background in the law.  They also challenge the limitations placed on inmate law clerks, who, per prison policy, are not allowed to give legal advice, conduct legal research for other inmates, or assist in drafting legal pleadings.  The hiring and use of inmate law clerks in the prison

---

[8]   While I can conceive of circumstances in which an indigent inmate might be entitled to a court order exempting him from photocopying charges in a particular case, plaintiffs' claim that the 10¢ per copy charge is in all cases an impermissible interference with an inmate's right of access to the courts simply has no merit.

18

law library, despite plaintiffs' protestations, does not deny plaintiffs their constitutional right of access to the courts. Not only have plaintiffs failed to demonstrate an actual injury stemming from this policy, but such a policy is reasonably related to a legitimate penological interest, and is therefore valid.

Contrary to plaintiffs' assertions, there is no freestanding constitutional right to legal advice. Shaw v. Murphy, 532 U.S. 223, 231 n.3 (2001). Rather, under the Supreme Court's "right-of-access precedents, inmates have a right to receive legal advice from other inmates only when it is a necessary means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." Id. (quotations and citations omitted); Lindquist v. Idaho State Bd. of Corr., 776 F.2d 851, 857 (9th Cir. 1985) ("Inmate law clerks need not be extensively trained to possess adequate ability to assist disadvantaged inmates and to provide them constitutionally sufficient access to the courts."). This is not the case here. The prison provides ample resources to inmates to ensure that they have access to the courts. Plaintiffs' own success in presenting their claims demonstrate the sufficiency of

19

the access provided.  See Lewis, 518 U.S. at 360 ("the Constitution does not require that prisoners . . . be able to conduct generalized research, but only that they be able to present their grievances to the courts").  Plaintiffs fail to identify any actual injury stemming from the prison's policy of prohibiting inmate law clerks from assisting on legal issues.

The prison's policy on the hiring and use of inmate law clerks also serves a legitimate penological interest.  "[I]t is 'indisputable' that inmate law clerks 'are sometimes a menace to prison discipline' and that prisoners have an 'acknowledged propensity . . . to abuse both the giving and the seeking of [legal] assistance.'"  Shaw, 532 U.S. at 231 (quoting Johnson v. Avery, 393 U.S. 483, 488 (1969)).  For this reason the prison prohibits any inmates from rendering legal advice of any kind to other inmates while in the law library without approval from the warden.  Likewise, the importance of maintaining order in the law library requires the hiring of inmate law clerks who will follow prison rules and regulations.  This includes not assisting other inmates by rendering legal advice, something Cookish admits he has done.  Thus, the prison's policy of hiring inmate law clerks who follow the rules and regulations of the prison by not

20

dispensing legal advice or drafting pleadings for other inmates is consistent with upholding the legitimate penological interest of maintaining prison discipline. Therefore, under Overton, the prison's inmate law clerk policies are valid even if plaintiffs could establish that the policies interfered with their abilities to access the courts in particular cases.

C.    **Adequacy of Research Materials**

Plaintiffs also argue the prison law library is inadequate. They point to the transition period when the library switched from mostly hardbound books to computer based resources, and claim that the library failed to maintain current law and failed to provide computer access to legal research materials. The facts, however, do not support this allegation.

Much like the First Circuit held in previous litigation brought by Cookish, the plaintiffs here are "asking for too much." Cookish v. Cunningham, 787 F.2d 1, 5 (1st Cir. 1986). Like the library then in question, the NCF prison library "contain[s] numerous volumes on prisoner's rights, civil rights, habeas corpus, and legal research, as well as appropriate reporters, encyclopedias, dictionaries, and statute books." Id.; see also Lindquist, 776 F.2d at 856 ("the Prison need not provide

21

its inmates with a library that results in the best possible access to the courts"). The only difference is that the majority of these resources are now available in electronic format instead of in hardbound volumes. Inmates have access to most of their resources on Loislaw, and booklets as well as inmate law clerks are available to instruct inmates on the use of Loislaw. Any resource not available directly through Loislaw is available to the inmates through a request process with the librarian. The librarian has access to an expanded version of Loislaw through the internet and can submit inmate requests to the inmate attorney, the prison in-house counsel, and even to the New Hampshire Supreme Court library. Any required statute can be accessed through the librarian's version of Loislaw or by requesting copies of specific sections of the statute from the New Hampshire Supreme Court library. Although Cookish claims that Rouleau denied three different requests for statutes with their corresponding annotations, these denials were permissible as only one of the requested statutes and its corresponding annotations would have required over 380 pages be copied and sent from the New Hampshire Supreme Court library to the prison, an excessive request from any perspective. See Lewis, 518 U.S. at

22

355 ("Bounds does not guarantee inmates the wherewithal to transform themselves into litigating engines"). Moreover, Cookish was free to renew his request provided that he could narrow what he wanted into manageable sections. He never bothered to do so.

Given the library resources available to plaintiffs, it is difficult to see how the plaintiffs can credibly claim that they are denied access to the courts. Under Lewis, "the Constitution does not require that prisoners (literate or illiterate) be able to conduct generalized research, but only that they be able to present their grievances to the courts -- a more limited capability that can be produced by a much more limited degree of legal assistance." 518 U.S. at 360. Plaintiffs' ability to bring this suit and pursue it to the summary judgment stage is evidence in and of itself of plaintiffs' ability to gain meaningful access to the courts. See, e.g., Graham v. Cattell, Opinion No. 2003 DNH 20. More importantly, however, plaintiffs are still required under Lewis to demonstrate an actual injury resulting from the alleged inadequacy of the library. See also Christopher, 536 U.S. at 413-15. The mere "identification of speculative harm, that [they are] denied the opportunity to

23

litigate issues . . . that [they] might find in [resources not currently available in the library], is insufficient." Lambros v. Hawk, 993 F. Supp. 1372, 1373 (D. Kan. 1998). At best, this is all plaintiffs assert by claiming they are "wholly unable to do research on conditions of confinement issues [they] would like to pursue." (Pls.' Mot. for Summ. J. at 12.) Plaintiffs have failed to assert the requisite actual injury required by Lewis in their allegations of an inadequate law library.

D.   **Library Scheduling**

Finally, plaintiffs claim their right of access to the courts was impermissibly infringed by the prison's law library scheduling policies. Inmates are only given access to the law library once a week, for a four hour period. If inmates are late or fail to keep their scheduled appointment without informing the librarian, they are subject to disciplinary action. Cookish asserts that he was inappropriately targeted by Rouleau and had his scheduled library day changed from Monday to Thursday in June, 2003. This, Cookish, claims, denied him access to the library for a period of eight days.

Plaintiffs yet again fail to demonstrate an actual injury arising from the library scheduling policy that allegedly

24

infringed their right of access to the courts. Plaintiffs "must demonstrate that the alleged shortcomings . . . resulted in an actual injury with respect to existing or contemplated litigation, such as the inability to present a claim or to meet a filing deadline." Grimes v. Small, 34 Fed. Appx. 279, 280 (9th Cir. 2002). No such showing of actual injury has been made by plaintiffs. All that plaintiffs can show is reasonable delay and inconvenience, not an actual injury as required under Lewis.

In evaluating the reasonableness of the scheduling policy, it is important to note that "the Constitution does not guarantee a prisoner unlimited access to a law library. Prison officials of necessity must regulate the time, manner, and place in which library facilities are used." Lindquist, 776 F.2d at 858. Here, defendants are merely enforcing the reasonable prison policy regulating the use of the prison law library to ensure it is well maintained and that inmates are accounted for. "The fact that an inmate must wait for a turn to use the library does not necessarily mean that he has been denied meaningful access to the courts." Id.; Wilson v. Bruce, 816 F. Supp. 679, 680 (D. Kan. 1993) ("Meaningful access to the courts is not denied merely by inconvenient or reasonably restrictive access to the law

25

library."). A policy limiting inmates to four-hour visits once a week to the law library is clearly permissible as a regulation reasonably related to a legitimate penological interest. Even the eight-day delay in access that Cookish complains of is clearly permissible. See, e.g., Lewis, 518 U.S. at 362 (sixteen day delay in accessing legal material permissible); Campbell, 787 F.2d at 227 (delay of eight days in accessing library permissible).[9]

## IV.  CONCLUSION

Taking the facts in the light most favorable to the plaintiffs, I find the prison's photocopy policy, its hiring and use of inmate law clerks, its law library, and the law library scheduling to be constitutionally adequate to ensure plaintiffs' right of meaningful access to the courts. For this reason, and because plaintiffs' have alleged no actual injury, I deny

---

[9] There may well be circumstances in which an inmate may require more time in the law library than the current policy permits. If an inmate can demonstrate in a particular case that his right of access to the courts requires additional time in the law library, a court can always order the prison to give the inmate more time. In this case, however, plaintiffs have failed to make any such showing.

26

plaintiffs' motion for summary judgment (Doc. No. 21) and grant

defendants' motion for summary judgment (Doc. No. 35).

SO ORDERED.


_____
Paul Barbadoro
Chief Judge

March 11, 2004

cc:   Dennis R. Cookish, pro se
      Michael Donovan, pro se
      Andrew Livernois, Esq.

27