IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Fernando Nunez, Jr.,             :
                   Appellant      :
                               :
        v.                  :   No. 246 C.D. 2021
                               :   Submitted: April 14, 2022
D. Blough, CO Crokus, E. Levadnuk,   :
CO Marks, Sargeant Poborsky, CO     :
Pyle, B. Reeseman, Freddy Walters    :

BEFORE:    HONORABLE ANNE E. COVEY, Judge
                 HONORABLE ELLEN CEISLER, Judge
                 HONORABLE LORI A. DUMAS, Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION BY
JUDGE CEISLER                                     FILED: July 12, 2022

Appellant Fernando Nunez, Jr., (Nunez), an inmate currently imprisoned at the State Correctional Institution (SCI) at Mahanoy, appeals from the Court of Common Pleas of Somerset County's (Trial Court) February 4, 2021 order. Through this order, the Trial Court denied Nunez's request that he be allowed to proceed *in forma pauperis* in his lawsuit against Appellees D. Blough, CO Crokus, E. Levadnuk, CO Marks, Sergeant Poborsky, CO Pyle, B. Reeseman, and Freddy Walters[1] (collectively, Appellees) and, in addition, *sua sponte* deemed Nunez's suit to be frivolous and dismissed it on that basis. Upon review, we vacate in part and reverse in part.

---

[1] All of these individuals are identified by Nunez as being employees of the Department of Corrections who work at SCI-Somerset. *See* Compl. ¶¶4-11. Appellees' names, as presented in the caption, all reflect how those names were spelled in this matter's docketing statement. For clarity's sake, subsequent references to Appellees' ranks will use proper spelling for the relevant positions.

# I. Background

The relevant facts, as averred by Nunez in his Complaint and established through the Trial Court's handling of this matter, are as follows. Prior to his incarceration at SCI-Mahanoy, Nunez was confined at SCI-Somerset in that facility's restricted housing unit (RHU), where the incidents which gave rise to his lawsuit took place. Compl. ¶3. On January 24, 2019, shortly after 10:20 a.m., Correctional Officers Borstnar[2] and D. Blough informed another inmate, Joshua Lake, that a visitor had arrived to see him. *Id.* ¶12. While doing so, Borstnar said to Lake, "Who's coming up to see you? Your fucking boyfriend?" *Id.* This exchange prompted Nunez to swiftly inform Correctional Officer B. Reeseman that he wished to file a third-party complaint against both Blough and Borstnar pursuant to the Prison Rape Elimination Act of 2003 (PREA).[3] *Id.* ¶14. Reeseman acknowledged

---

[2] Nunez did not name Officer Borstnar as a defendant in his Complaint.

[3] 34 U.S.C. §§ 30301-30309. According to the Department of Corrections' written policy, the Department

> has zero tolerance for sexual abuse or sexual harassment of any individual under the supervision of the Department. . . . Anyone who engages in, fails to report, or knowingly condones sexual abuse or sexual harassment of an inmate shall be subject to disciplinary action, up to and including termination, and may be subject to criminal prosecution. An inmate, reentrant, detainee, employee, contractor, or volunteer of the Department is subject to disciplinary action and/or sanctions, including possible dismissal and termination of contracts and/or services, if he/she is found to have engaged in sexual abuse or sexual harassment of an inmate.
>
> . . . .
>
> The Department shall prohibit retaliation against an inmate who reports sexual abuse or sexual harassment, or staff member who reports sexual abuse or sexual harassment of an inmate, or who cooperates with sexual abuse or sexual harassment investigations.

**(Footnote continued on next page…)**

this, told Nunez that he would notify Sergeant Poborsky about Nunez's request, and then left the RHU. *Id.* ¶¶15-16. Roughly 30 minutes later, Officer Reeseman returned to the RHU to escort another inmate, Kurt Dupree, to the RHU's law library. *Id.* ¶¶15, 17. Nunez told Officer Reeseman that he was scheduled to go to the library as well, to which Reeseman responded, "Yeah. I know. But [Sergeant] Poborsky said you can't go because [Lieutenant Freddy] Walters has to take a PREA statement from you." *Id.* ¶¶18-19. Nunez protested that denying him access to the law library in response to his request to file a PREA complaint was retaliation and said he intended to file an internal prisoner grievance as a response. *Id.* ¶20. Officer Reeseman then accompanied Dupree to the law library and left Nunez behind, leading Dupree to remark to Reeseman, "You know [Nunez] is gonna write y'all up for burning him for law library." *Id.* ¶21. To this, Officer Reeseman responded, "Not if we write him up first. We[']re already two steps ahead of him. [Nunez] thinks he can keep filing all these lawsuits and threatening us with grievances and expect[s] us not to do anything? He ain't untouchable! Lawsuits and grievances don't scare me." *Id.* ¶22.

At approximately 11:45 a.m., Officers Blough and Reeseman took Nunez from his cell and placed him in the RHU's "strip cage." *Id.* ¶23. While in the strip cage, Nunez overheard Lieutenant Walters, Officer Borstnar, and Sergeant Poborsky discussing Nunez's intent to file a PREA complaint. *Id.* ¶¶24-25. Lieutenant Walters then entered the room in which the strip cage was located and said to Nunez,

> You[']re not helping yourself out by reporting a PREA [complaint] on my officers. It[']s not gonna [sic] go

---

Department Policy Statement DC-ADM 008 (April 22, 2019), https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/dc-adm-008.pdf (last visited July 11, 2022).

3

anywhere. Didn't you just see [the] PRC[4] yesterday? I read that [the PRC is] gonna [sic] allow you to do a step-down program here to get you off of RRL.[5] Well I'm gonna [sic] talk to Captain Brothers[6] about that. My officers don't feel safe around you. You keep filing grievances and lawsuits on all my good officers.

*Id.* ¶26. After Lieutenant Walters finished speaking, Nunez gave his PREA complaint statement to Walters and then asked whether he could use the RHU's law library. *Id.* ¶27. Lieutenant Walters denied this request, stating: "[Sergeant] Poborsky already told you no. It was [your choice to either go to the] law library or give a PREA statement. You chose to make a PREA statement. So you burnt yourself as far as I'm concerned. Next time you should just mind your business." *Id.* ¶28. Officers Blough and Reeseman then took Nunez back to his cell; along the way, Nunez called out that he intended to file grievances against Officer Blough, Sergeant

---

[4] An RRL, or Restricted Release List, is a list of inmates who are not permitted to be housed in the general population. An inmate may be put on an RRL when they are deemed to "pose[] a threat to the secure operation of the [Department] facility [at which they are held] and where a transfer to another facility or jurisdiction would not alleviate the security concern." Department Policy Statement DC-ADM 002 (April 18, 2022), https://www.cor.pa.gov/ About%20Us/Documents/DOC%20Policies/802%20Administrative%20Custody%20Procedures. pdf (last visited July 11, 2022). This designation is subject to regular review, and an inmate can be removed from an RRL if the Department's Executive Deputy Secretary for Institutional Operations approves such a move in writing. *Id.*

[5] A PRC, or Program Review Committee, is "[a] committee [at a Department facility] consisting of three staff members that conduct Administrative Custody Hearings, periodic reviews, make decisions regarding continued confinement in the . . . RHU[] and/or Special Management Unit (SMU) and hear all first level appeals of misconducts." Department Policy Statement DC-ADM 001 (May 23, 2022), *available at* https://www.cor.pa.gov/About%20Us/Documents/ DOC%20Policies/801%20 Inmate%20Discipline.pdf (last visited June 28, 2022). A PRC is also vested with the ability to make recommendations regarding whether an inmate should be removed from an RRL. *See* DC-ADM 002.

[6] It is not exactly clear from the record who Captain Brothers is, but it is implied through the Complaint that Brothers holds some sort of elevated supervisory role at SCI-Somerset. *See* Compl. ¶59.

Poborsky, and Officer Reeseman for preventing him from using the law library. *Id.* ¶¶29-31.

SCI-Somerset's staff then promptly initiated disciplinary action against Nunez. Around 1:30 p.m., Sergeant Poborsky gave Nunez a misconduct citation, in which Poborsky falsely stated that Nunez had threatened an SCI-Somerset employee. *Id.* ¶32. In response to this citation, Lieutenant Walters issued an order that suspended Nunez's ability to participate in outdoor recreational activities, take showers, or use the law library or phones for a period of seven days. *Id.* ¶¶33-34. Nunez then filed a written grievance regarding the citation and consequent punishment, which was rejected by SCI-Somerset's grievance coordinator and was instead treated as a PREA complaint, and also reported his complaint orally to another member of SCI-Somerset's staff. *Id.* ¶¶37-38.

Nunez's insistence on filing grievances and PREA complaints subsequently led to additional, negative reactions from the staff at SCI-Somerset. On January 30, 2019, Nunez told Correctional Officer Pyle that he wished to file an inmate abuse claim against Officer Borstnar, due to unspecified verbal threats Officer Borstnar had made to Nunez through the RHU's intercom system. *Id.* ¶¶39-40. Instead of helping Nunez, however, Officer Pyle replied, "Sucks to be you!" *Id.* ¶41. John H. Shearer, the RHU's counselor, then recorded Nunez's complaint regarding Officer Borstnar. *Id.* ¶42. Later on, Officer Pyle refused to give Nunez a food tray while handing out lunch that day; in Nunez's view, Pyle did this to punish him for grieving Officer Borstnar. *Id.* ¶43. Nunez complained about Officer Pyle's actions to Correctional Officer Marks, who responded, "If you withdraw that inmate abuse [complaint] you just filed [against Officer] Borstnar, I'll give you two trays." *Id.* ¶45. When Nunez declined Officer Marks' offer, Marks replied that he would not

5

give Nunez a tray either. *Id.* Nunez then filed a written grievance against Officer Pyle, which, like his original grievance regarding the misconduct citation, was treated as a PREA complaint, and also reported his complaint orally to Officer Marks. *Id.* ¶¶44, 47.

The following day, February 1, 2019, Officers Crokus, Marks, and Reeseman entered the RHU to collect food trays that had been given to the RHU's inmates at breakfast time. *Id.* ¶49. When Officer Crokus approached Nunez's cell, Nunez told Crokus that he was worried that Officers Marks and Reeseman would retaliate against him for filing grievances against them and other SCI-Somerset staffers and asked Crokus to file an incident report. *Id.* ¶¶50-51.[7] Officer Crokus replied that he would have to speak to Lieutenant E. Levadnuk about how Crokus should handle Nunez's request and then asked Nunez whether he wanted to take a shower, to which Nunez replied in the affirmative. *Id.* ¶¶51-52. Officer Marks then approached Officer Crokus and said, "[Nunez] can't shower. [Sergeant] Poborsky and [Lieutenant] Levadnuk said he's still on restricted movement." *Id.* ¶53. When Officer Crokus rejoined that Nunez's punishment had ended the previous day, Officer Marks told him, "You need to talk to [Lieutenant] Levadnuk and [Sergeant] Poborsky. They said [Nunez] can't shower. So I'm not letting him shower. Period." *Id.* ¶¶53-54. Officer Crokus then left the RHU to find his superiors and, after a brief interlude, returned to tell Nunez that "[Lieutenant] Levadnuk and [Sergeant] Poborsky told me not to let you shower. [They're] pissed off about all those grievances and PREA [complaints] you filed." *Id.* ¶55. Officer Crokus also stated Levadnuk and Poborsky had told him to make up a reason for denying Nunez's request for a shower. *Id.* ¶56. Nunez asked Officer Crokus whether he was going to file a written report regarding

---

[7] Curiously, Nunez does not aver or imply prior to this point in his Complaint that he filed a grievance or PREA complaint against Officer Marks.

this retaliation against Nunez, but Crokus replied, "I can't. [Lieutenant] Levadnuk said not to." *Id.* ¶57. Nunez filed two more written grievances regarding what had taken place on February 1, 2019, one of which was ultimately treated as a PREA complaint. *Id.* ¶58. In addition, Nunez lodged a written complaint with Captain Brothers, who passed the complaint along to a subordinate that undertook an investigation of Nunez's allegations. *Id.* ¶59.

On January 22, 2021, Nunez filed a civil action pursuant to 42 U.S.C. § 1983[8] against Appellees in the Trial Court, alleging therein that Appellees had violated his First Amendment[9] rights by retaliating against him "for engaging in constitutionally protected conduct." Compl., Introduction. In addition, Nunez asked that the Trial Court allow him to proceed *in forma pauperis*. On February 4, 2021, the Trial Court denied Nunez's request for *in forma pauperis* status and, in a *sua sponte* manner, dismissed Nunez's Complaint pursuant to Pennsylvania Rule of Civil Procedure

---

[8] Enacted as part of the Civil Rights Act of 1871, this statute allows individuals to sue a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983.

[9] The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievance." U.S. CONST. amend. I. The rights secured by the First Amendment, which include prisoners' ability to file administrative grievances and legal actions, are enforceable at the state level by virtue of the Fourteenth Amendment's Due Process Clause. *Bush v. Veach*, 1 A.3d 981, 985 (Pa. Cmwlth. 2010); *Yount v. Pa. Dep't of Corr.*, 966 A.2d 1115, 1121 (Pa. 2009); *Meyer v. Grant*, 486 U.S. 414, 420 (1988); *Johnson v. Avery*, 393 U.S. 483, 485 (1969); *Gitlow v. N.Y.*, 268 U.S. 652, 666 (1925); *see* U.S. CONST. amend. XIV, § 1 (stating, in relevant part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]").

7

240(j)(1), on the basis that Nunez's legal claims were frivolous.[10] In the accompanying opinion, the Trial Court explained that the Complaint's dismissal was warranted because Nunez had failed to articulate a viable retaliation claim. Trial Court Op., 2/4/21, at 5-13.

On February 16, 2021, Nunez mailed a Motion for Reconsideration and a Motion for Leave to Amend Complaint Under Pa. R.C.P. 1033(a) (Motion to Amend) to the Trial Court. *See* Nunez's Br., Ex. 2; Reproduced Record (R.R.), App. 1.[11] Having received no response from the Trial Court, Nunez then appealed the Trial Court's February 4, 2021 dismissal order via paperwork that reached our Court on March 4, 2021.[12] On March 5, 2021, the Trial Court ordered Nunez to file a

---

[10] Pennsylvania Rule of Civil Procedure 240(j)(1) provides that "[i]f, simultaneous with the commencement of an action or proceeding or the taking of an appeal, a party has filed a petition for leave to proceed *in forma pauperis*, the court prior to acting upon the petition may dismiss the action, proceeding or appeal if the allegation of poverty is untrue or if it is satisfied that the action, proceeding or appeal is frivolous." Pa. R.Civ.P. 240(j)(1). "A frivolous action or proceeding has been defined as one that 'lacks an arguable basis either in law or in fact.'" *Id.*, Note (quoting *Neitzke v. Williams*, 490 U.S. 319, 325 (1989)). "An action is frivolous under this provision, if, on its face, it does not set forth a valid cause of action." *Bailey v. Wakefield*, 933 A.2d 1081, 1083-84 (Pa. Cmwlth. 2007).

[11] Nunez has failed to comply with the Rules of Appellate Procedure's technical requirements regarding how a reproduced record's pages must be numbered. *See* Pa. R.A.P. 2173 ("[T]he pages of . . . the reproduced record . . . shall be numbered separately in Arabic figures[,] . . . thus 1, 2, 3, etc., followed . . . by a small a, thus 1a, 2a, 3a, etc."). For simplicity's sake, however, we will nevertheless cite to Nunez's Reproduced Record by using the designations provided by Nunez.

[12] Nunez's appeal is dated as having been submitted on March 1, 2021, but there is no evidence within the record as currently constituted that clearly shows when he actually mailed his paperwork or handed it to prison officials. *See* Notice of Appeal at 1-4. "Under the prisoner mailbox rule, a prisoner's *pro se* appeal [or other filing] is deemed filed at the time it is given to prison officials or put in the prison mailbox." *Kittrell v. Watson*, 88 A.3d 1091, 1096 (Pa. Cmwlth. 2014). Regardless, Nunez's appeal to our Court was timely, as the appeal window did not close until March 8, 2021, and we received his appeal paperwork before that date. *See* Pa. R.A.P. 903(a) **(Footnote continued on next page…)**

8

Statement of Errors Complained of on Appeal (Statement of Errors) within 21 days, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). The Trial Court's prothonotary subsequently received both the Motion for Reconsideration and the Motion to Amend on March 8, 2021. *See* Nunez's Br., Ex. 2; R.R., App. 1. Despite this, and for reasons that are not clear to this Court, only the Motion for Reconsideration was formally docketed by the prothonotary and ruled upon by the Trial Court, which denied the Motion for Reconsideration on March 11, 2021.[13]

On April 30, 2021, this Court received from Nunez an Application for Remand to File *Nunc Pro Tunc* Statement of Errors Complained of and to Correct or Modify the Record (Remand Application). Therein, Nunez requested that we remand this matter to the Trial Court to allow him to file a Statement of Errors *nunc pro tunc*, due to what he claimed was SCI-Somerset's repeated failure to deliver mail sent to him by the Trial Court, including the Trial Court's March 5, 2021 order directing him to file a Statement of Errors. Remand Application at 1-5. We granted Nunez's Remand Application on July 29, 2021, and remanded this matter to the Trial Court with instructions that it "review evidence and determine whether [Nunez] should be permitted to file *nunc pro tunc* his Statement of Errors[.]" Commonwealth Court Order, 7/29/21, at 1. On August 5, 2021, the Trial Court granted Nunez leave to file his Statement of Errors *nunc pro tunc* within 21 days. Trial Court Order,

_____

(establishing general rule that a party has 30 days from an order's entry to file an appeal); 1 Pa. C.S. § 1908 (when the last day of a filing period falls on a weekend or holiday, that weekend or holiday is omitted from the calculation).

[13] The copy of Nunez's Motion to Amend that he attached to his appellate brief is stamped in a manner that clearly shows it was received and "filed for record" by the Trial Court's prothonotary on March 8, 2021. *See* Nunez's Br., Ex. 2. There are, however, no corresponding docket entries that establish that the prothonotary actually placed Nunez's Motion to Amend on the case docket and the Motion to Amend was not included in the record that was transmitted to this Court by the Trial Court.

9

8/5/21, at 1. Nunez complied with the Trial Court's order by sending his Statement of Errors to the Trial Court via mail on August 16, 2021.

## II. Discussion

On appeal,[14] Nunez puts forth what amounts to three distinct arguments, which we summarize and reorder as follows. First, the Trial Court erred and abused its discretion by concluding at this stage of the litigation that Nunez's retaliation claim was frivolous and dismissing Nunez's Complaint on that basis. Nunez's Br. at 9-19. Second, the Trial Court erred by denying Nunez's Motion for Reconsideration. *Id.* at 19. Finally, the Trial Court erred by failing to rule upon and grant Nunez's Motion to Amend. *Id.* at 12-14.

As to Nunez's first issue, an inmate must satisfy four requirements in order to set forth a valid prison retaliation claim. Specifically, they must show by a preponderance of the evidence that "[(1) they] engaged in constitutionally protected conduct[; (2)] prison officials took adverse action[; (3)] the protected conduct was a substantial or motivating factor for the action . . . [; and (4)] the retaliatory action [did] not advance legitimate penological goals." *Yount v. Dep't of Corr.*, 966 A.2d 1115, 1120-21 (Pa. 2009). The burden of proof remains upon the inmate at all times in the context of a retaliation claim of this nature. *Id.* at 1121. However, it is also the case that a court must consider all factual allegations in an inmate's complaint to be true when determining whether the legal claims therein are frivolous for purposes of Pennsylvania Rule of Civil Procedure 240(j)(1). *McGriff v. Vidovich*, 699 A.2d 797, 798 (Pa. Cmwlth. 1997). As such, a court can only dismiss a *pro se* action under this

---

[14] "Appellate review of a decision dismissing an action pursuant to Pa. R.C[iv].P. [] 240(j)(1) is limited to determining whether [the] appellant's constitutional rights have been violated and whether the trial court abused its discretion or committed an error of law." *Jones v. Doe*, 126 A.3d 406, 408 n.3 (Pa. Cmwlth. 2015).

provision when the causes of action articulated therein are not viable even on a facial level and, thus, are unambiguously frivolous. *Bailey*, 933 A.2d at 1083-84.

Here, the Trial Court determined that Nunez had "clearly" satisfied the first prong of this test, but that his retaliation claim was frivolous because he had failed to surmount the bars established by the three other prongs. Trial Court Op., 2/4/21, at 5-13. We agree with the Trial Court regarding the first prong. Though "confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment," *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977), it is equally true that "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228 (2001). Accordingly, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Among this bundle of retained First Amendment rights is the ability to file complaints and grievances against a correctional facility's employees. *Brown v. Blaine*, 833 A.2d 1166, 1170-71 (Pa. Cmwlth. 2003). Nunez's filing of such materials was thus clearly a form of constitutionally protected conduct.

Even so, we conclude that the Trial Court's reasoning regarding each of the remaining prongs was flawed and legally incorrect. With regard to the second prong, an "'[a]dverse action,' for purposes of evaluating an inmate's retaliation claim, is one which is 'sufficient to deter a person of ordinary firmness from exercising his [constitutional rights.]'" *Yount*, 966 A.2d at 1121 (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). Generally speaking, allegedly retaliatory conduct does not constitute adverse action unless it would have more than a *de minimis* impact

11

upon such a person's willingness to exercise those rights. *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006).[15] However, it is not the case "that repeated incidents of what might otherwise be trivial 'harassment' can never be actionable. The cumulative impact of retaliatory acts may become actionable even though the actions would be *de minimis* if considered in isolation." *Brennan v. Norton*, 350 F.3d 399, 422 n.17 (3d Cir. 2003). "Where a plaintiff advances a colorable, but not necessarily incontrovertible, argument he was subjected to adverse action, the issue is best resolved by the fact-finder." *Yount*, 966 A.2d at 1121 (citing *Allah*, 229 F.3d at 225).

In this instance, the Trial Court offered a number of explanations for why it determined that Appellees had not taken adverse action against Nunez, specifically: (1) Nunez was not deterred by Appellees' conduct from filing grievances, internal complaints, and the lawsuit that gave rise to this appeal; (2) persuasive and precedential case law establish that filing an allegedly false misconduct charge and limited instances of preventing an inmate from accessing the prison law library, receiving a food tray, and showering each do not constitute examples of adverse actions; (3) Nunez could not use this action to challenge the misconduct charge; and (4) neither the manner in which the misconduct charge was handled procedurally nor the punishment Nunez received as a result of that charge were constitutionally suspect. Trial Court Op., 2/4/21, at 6-9.

---

[15] [W]e recognize that we are not bound to follow the decisions of federal district and intermediate appellate courts on issues of federal law. . . . However, although decisions of the federal courts lower than the U.S. Supreme Court are not binding on Pennsylvania courts, they may be considered as persuasive authority with regard to federal questions. . . . Thus, when possible, it is appropriate for a Pennsylvania appellate court to follow the Third Circuit's ruling on federal questions to which the U.S. Supreme Court has not yet provided a definitive answer.

*W. Chester Area Sch. Dist. v. A.M.*, 164 A.3d 620, 630 (Pa. Cmwlth. 2017) (citations omitted).

Each of these explanations, however, reveals stark errors in the Trial Court's analysis. First, the operative question is not whether *Nunez* was deterred from exercising his constitutional rights, but whether *a person of ordinary firmness* would have been deterred under the circumstances faced by Nunez.[16] *Yount*, 966 A.2d at 1121; *see Mirabella v. Villard*, 853 F.3d 641, 650 (3d Cir. 2017) (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1252 (11th Cir. 2005)) ("There is good reason for such a rule: we will not 'reward' government officials for picking on unusually hardy speakers. At the same time, we recognize that government officials should not be liable when the plaintiff is unreasonably weak-willed."). Second, while isolated examples of denying an inmate access to legal resources, a meal, recreation, or showers might be viewed by a person of ordinary firmness as nothing more than a *de minimis* deterrent to exercising their constitutional rights, the context in which an action of this nature takes place must be considered before deeming such a denial to be of trivial effect. *Brennan*, 350 F.3d at 422 n.17. Where, as here, an inmate alleges that prison officials imposed a series of punishments in close temporal proximity to the inmate's actual exercise of their First Amendment rights, or their stated intent to do so, as well as that those officials also expressed or undertook some form of opposition to the inmate's efforts, it follows that, at minimum, the inmate has raised a colorable, non-frivolous claim that they were subjected to adverse action. *Id.*; *Yount*, 966 A.2d at 1121. Finally, Nunez was not seeking to challenge the punishment he received as a result of the misconduct charge that Sergeant Poborsky lodged against him, or the process by which that charge was administratively

---

[16] Inexplicably, the Trial Court recited the ordinary firmness standard in its February 4, 2021 opinion, but then completely ignored it by immediately shifting to a discussion of how *Nunez himself* was not personally deterred from exercising his constitutional rights. *See* Trial Court Op., 2/4/21, at 6-7.

adjudicated; rather, Nunez's position was simply that the charge and consequent punishment were retaliatory in nature and, thus, constituted unconstitutionally adverse action. Nunez's Br. at 17; *cf. Allah*, 229 F.3d at 224-25 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999) ("[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.")). Therefore, we conclude that Nunez has facially established that he was subjected to adverse action, in line with the second prong's requirements.

Moving on to the third prong, there are two methods by which an inmate can establish that their constitutionally protected activity was a substantial or motivating factor behind adverse action in a retaliation case. First, the inmate can show that the "timing of the alleged retaliatory action is unusually suggestive of retaliatory motive." *Yount*, 966 A.2d at 1122 (quoting *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)) (cleaned up). Second, and in the alternative, the inmate can set forth "a pattern of antagonism coupled with timing that suggests a causal link" between the adverse action and the inmate's efforts to exercise their constitutional rights. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016). "Moreover, causation, like any other fact, can be established from the evidence gleaned from the record as a whole." *Id.* at 424.

The Trial Court's analysis regarding this prong is lacking as well. While the Trial Court acknowledged that there was "certainly a temporal proximity" between when Nunez vocalized his desire to file a PREA complaint and when Sergeant Poborsky issued a misconduct citation against him, it still ruled that Nunez had failed to meet the third prong's requirements. Trial Court Op., 2/4/21, at 10-11. This was

14

because, in the Trial Court's view, Nunez's averments did not articulate a sufficiently strong basis for determining that Sergeant Poborsky's issuance of that citation was in response to Nunez's efforts to exercise his First Amendment rights. *Id.*

This conclusion, however, misses the forest for the trees. Taking Nunez's averments as true, as we must at this stage, several important points are both readily apparent and provide important context for Sergeant Poborsky's behavior. First, Sergeant Poborsky first became aware of Nunez's desire to file a third-party PREA complaint at some point between approximately 10:25 a.m. and 10:55 a.m. on January 24, 2019, and responded by immediately denying Nunez the ability to go to his scheduled appointment at the RHU's law library. Compl. ¶¶14-19. Nunez was then taken to the RHU's "strip cage" room around 11:45 a.m., where he verbally presented his PREA complaint to Lieutenant Walters shortly thereafter and then asked if he could use the law library, a request which Walters denied. *Id.* ¶¶24-28. Nunez was then taken back to his cell and yelled while on his way there that he intended to file grievances against several RHU staffers, including Sergeant Poborsky, for preventing him from using the law library. *Id.* ¶¶29-31. Sergeant Poborsky then issued the misconduct citation against Nunez around 1:30 p.m., on the basis that Nunez had threatened an SCI-Somerset employee. *Id.* ¶32. Thus, no more than approximately 90 minutes elapsed between Nunez's expression of intent to file those grievances and Sergeant Poborsky's issuance of the misconduct citation, during which time Nunez had no other contact or communication with prison staff. Given this, it is indisputable that Nunez has articulated a scenario that strongly suggests, at least at a *prima facie* level, that the latter was done by Sergeant Poborsky in retaliation for the former.

15

Moreover, the Trial Court's singular focus upon Sergeant Poborsky's actions on January 24, 2019, ignored the broader issue of how Nunez was treated by the other RHU staffers named in the Complaint. In doing so, the Trial Court specifically overlooked the following incidents. On January 24, 2019, Officer Reeseman expressed his intent to preempt Nunez's filing of a grievance against him by "writ[ing Nunez] up first"; that same day, Lieutenant Walters effectively threatened Nunez's ability to be removed from SCI-Somerset's RRL and to be returned to the facility's general population, told him that his PREA complaint against Officer Borstnar was not going to be handled properly, and made clear that his decision to deny Nunez's request to use the law library was motivated in part by Nunez's filing of that complaint; subsequently, on January 30, 2019, Officer Pyle antagonized Nunez regarding Officer Borstnar's verbal threats and denied Nunez food in response to Nunez's decision to file a PREA complaint against Borstnar; shortly thereafter, Officer Marks effectively tried to bribe Nunez with additional meal trays in order to get Nunez to withdraw his PREA complaint against Officer Borstnar, but then refused to give Nunez any food when he declined Marks' offer; and both Officers Crokus and Marks prevented Nunez from taking a shower later that day, doing so under false pretenses, as directed by Lieutenant Levadnuk and Sergeant Poborsky, on account of Nunez's grievances and PREA complaints. *See id.* ¶¶17-23, 26-28, 32-33, 39-46, 49-57. Each of these actions suggests not just a strong likelihood that they were prompted by Nunez's efforts to file grievances and PREA complaints, but that Nunez's conduct was their *but for cause*. Therefore, even if we were to disregard how Sergeant Poborsky acted on January 24, 2019, and the temporal relationship between those acts and Nunez's grievances, it remains that Nunez articulated a multitude of other *prima facie* valid examples of adverse actions

16

that were directly motivated by his constitutionally protected conduct.[17] Accordingly, we conclude that Nunez has satisfied the third prong on a facial basis.

Turning to the fourth and final prong, an inmate must, at minimum, aver facts from which an inference could be drawn that the retaliatory actions did not further a legitimate penological goal. *Richardson v. Wetzel*, 74 A.3d 353, 358 (Pa. Cmwlth. 2013). "Claims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule." *Horan v. Newingham* (Pa. Cmwlth., No. 2622 C.D. 2015, filed Oct. 24, 2016), slip op. at 9, 2016 WL 6156221, at \*5 (quoting *Hartsfield v. Nichols*, 511 F.3d 826, 829 (8th Cir. 2008)).[18] "Thus, a defendant may successfully defend a retaliatory discipline claim by showing some evidence the inmate actually committed a rule violation." *Id.*

Here, the Trial Court determined that Nunez had failed to plead facts that were sufficient to show that the charges underlying the misconduct citation were false and, in addition, that there was "some evidence" that the citation was in response to Nunez's violation of SCI-Somerset's internal regulations. Trial Court Op., 2/4/21, at 11-13. From the Trial Court's perspective, Nunez's allegations regarding the misconduct citation's falsity were "conclusory" and his vocalizing of his intention to file grievances against several RHU staffers was a threat that constituted "an actual prison violation [sic]" that justified the misconduct citation. *Id.* at 12-13. As

---

[17] It is also notable that members of the RHU's staff considered Nunez to be a troublemaker of sorts even before the events that gave rise to this suit occurred, because he regularly filed grievances and lawsuits against them. *See* Compl. ¶¶21-22, 25-26. This generally negative perception of Nunez places the RHU staffers' actions toward him in an even more concerning light.

[18] Unreported Commonwealth Court opinions issued after January 15, 2008, may be cited for their persuasive value. *See* Internal Operating Procedures of the Commonwealth Court Section 414(a), 210 Pa. Code § 69.414(a).

such, the Trial Court concluded that Nunez would be unable to establish that the citation had not been issued in furtherance of a legitimate penological goal. *Id.*

In doing so, however, the Trial Court made multiple mistakes. First, the Trial Court erroneously determined that Nunez's allegations were conclusory, because it focused too narrowly on his claims that the misconduct citation was issued under false pretenses and was retaliatory in nature. As already discussed, Nunez has averred facts in his Complaint that established a facially plausible argument that Sergeant Poborsky's decision to cite him for threatening an SCI-Somerset employee was pretextual in nature. Second, the Trial Court's conclusion that the misconduct citation was justified on the basis of Nunez's so-called threat to grieve several RHU staffers was manifestly incorrect. As we have already mentioned, while carceral confinement brings with it certain limitations on inmates' constitutional rights, it does not follow that prisoners are stripped of all such rights by virtue of their incarceration. *Jones*, 433 U.S. at 125; *Pell*, 417 U.S. at 822; *Shaw*, 532 U.S. at 228. In line with this, and despite their imprisonment, inmates have a First Amendment-protected right to grieve a correctional facility's employees. *Brown*, 833 A.2d at 1170-71. To hold, as the Trial Court did here, that an inmate's expressed intent to file such grievances constitutes a threat for which the inmate can be punished would make a mockery of the underlying, constitutionally protected right to actually do so.[19] Finally, even if we theoretically agreed with the Trial Court's analysis of the misconduct citation, we would be unable to ignore, as the Trial Court did, the aforementioned litany of other retaliatory acts perpetrated against Nunez by RHU

---

[19] This is not to say that an inmate cannot be punished if their expressed intent to grieve a prison employee is coupled with some form of physical or verbal threat, or with another kind of impermissible behavior. What remains the case, though, is that punishing an inmate solely because they said they were going to file a grievance runs afoul of the First Amendment.

staffers that, based upon that facts averred by Nunez in his Complaint, do not appear to have furthered a legitimate penological goal. Consequently, we conclude that Nunez has facially fulfilled the fourth prong's prerequisites.

### III. Conclusion

In accordance with the foregoing analysis, we hold that Nunez's retaliation claim was not frivolous, as well as that the Trial Court erred by concluding otherwise and dismissing Nunez's Complaint pursuant to Pennsylvania Rule of Civil Procedure 240(j)(1). Accordingly, we reverse the Trial Court's February 4, 2021 order in part, regarding this dismissal, vacate it in part, as to the Trial Court's denial of Nunez's request to proceed *in forma pauperis*, and remand this matter to the Trial Court for further proceedings. In addition, we direct the Trial Court on remand to ensure that Nunez's Motion to Amend is properly docketed and to rule upon both that Motion and the merits of Nunez's *in forma pauperis* request within 30 days.[20]

_____
ELLEN CEISLER, Judge

---

[20] Nunez's remaining argument, *i.e.*, that the Trial Court erroneously denied his Motion for Reconsideration, has been rendered moot due to our disposition of this matter. We note, however, that a lower court's denial of a motion for reconsideration that pertains to a final order is not reviewable on appeal. *Thorn v. Newman*, 538 A.2d 105, 108 (Pa. Cmwlth. 1988).

19

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Fernando Nunez, Jr., | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 246 C.D. 2021 |
| | : | |
| D. Blough, CO Crokus, E. Levadnuk, | : | |
| CO Marks, Sargeant Poborsky, CO | : | |
| Pyle, B. Reeseman, Freddy Walters | : | |

## O R D E R

AND NOW, this 12th day of July, 2022, it is hereby ORDERED:

1. The Court of Common Pleas of Somerset County's (Trial Court) February 4, 2021 order, through which the Trial Court dismissed Appellant Fernando Nunez, Jr.'s (Nunez) lawsuit against Appellees D. Blough, CO Crokus, E. Levadnuk, CO Marks, Sargeant Poborsky, CO Pyle, B. Reeseman, and Freddy Walters as frivolous pursuant to Pennsylvania Rule of Civil Procedure 240(j)(1), is REVERSED IN PART, as to this dismissal, and VACATED IN PART, as to the Trial Court's denial of Nunez's request for *in forma pauperis status*;

2. This matter is REMANDED to the Trial Court for further proceedings;

3. On remand, the Trial Court shall ensure that Nunez's Motion for Leave to Amend Complaint Under Pa. R.C.P. 1033(a) is properly docketed and shall rule upon both that Motion and the merits of Nunez's *in forma pauperis* request within 30 days.

Jurisdiction relinquished.

_____
ELLEN CEISLER, Judge